**TOWNSHIP OF SOUTH FAYETTE, Plaintiff,**

v.

**ALLEGHENY COUNTY HOUSING AUTHORITY, the United States Department of Housing and Urban Development, and its Secretary, Redevelopment Authority of Allegheny County and its Executive Director, the County of Allegheny, Cheryl Sanders, Cecile White, Cheryl Ulrich, Martha Surratt, Sara H.**

**Williams, Kelly Vick, individually and on behalf of all others similarly situated, Christians for a Better Community, Inc., and the Task Force established by the Consent Decree Entered in Civil Action No. 88-1261, Sanders, et al. v. HUD et al., Defendants.**

**Civil Action No. 98-1565.**

United States District Court, W.D. Pennsylvania.

Nov. 17, 1998.

---

Romel L. Nicholas, Gaitens, Tucceri & Nicholas, Pittsburgh, PA, for Plaintiff.

Raymond N. Baum, Rose, Schmidt, Hasley & DiSalle, Pittsburgh, PA, Neva L. Stanger, Campbell Durrant & Beatty, P.C., Pittsburgh, PA, for Allegheny County Housing Authority.

Henry A. Azar, Jr., Michael Sitcov, Attorneys, Dept. of Justice, Civil Division, Washington, DC, Steven Cerny, Office of General Counsel, United States Department of Housing and Urban Development, Washington, D.C., for The United States Department of Housing and Urban Development.

Donald Driscoll, Community Justice Project, Pittsburgh, PA, for Sanders Plaintiff Class Members.

John W. Joyce, Allegheny County Housing Authority, Pittsburgh, PA, J. Deron Gabriel, Assistant County Solicitor, Allegheny County Law Department, Pittsburgh, PA, Robert N. Pierce, Counsel to Redevelopment Authority of Allegheny County, Pittsburgh, PA, for Redevelopment Authority of Allegheny County.

*OPINION*

DIAMOND, District Judge.

The Township of South Fayette ("South Fayette") commenced this suit with a complaint seeking an injunction prohibiting the Allegheny County Housing Authority ("ACHA") from acquiring nine townhouses in South Fayette for use in a county-wide public housing program. ACHA is purchasing the townhouses as so-called "scattered-site" single-family public housing units pursuant to the mandates of a Consent Decree negotiated and entered into by The United States Department of Housing and Urban Development ("HUD"), ACHA, Allegheny County ("County"), and the Redevelopment Authority of Allegheny County, defendants, and a certified class of plaintiffs in settlement of the case of *Sanders, et al. v. United States Department of Housing and Urban Development, et al.,* 872 F.Supp. 216 (W.D.Pa.1994) ("*Sanders* ").

South Fayette originally advanced the allegations set forth in the instant complaint in the case of *Allegheny County Housing Authority v. Township of South Fayette,* Civil Action 98–1005 (W.D.Pa.), as a counterclaim which it filed along with a motion for a temporary restraining order or a preliminary injunction. On September 16, 1998, Judge Robert J. Cindrich of this court entered an order in that case severing the counterclaim and motion for injunctive relief from it and transferring them to this member of the court as a matter related to *Sanders.*

The following day this court held a status conference on the matter. At that conference the court noted that ACHA's impending acquisition of the South Fayette townhouses was in compliance with the provisions of the *Sanders* Decree and that since the injunction sought by South Fayette obviously would impede and otherwise adversely affect the rights and obligations of all of the parties to that Decree they were indispensable parties within the meaning of Rule 19, Fed.R.Civ.P.,

28 U.S.C. (1998), in the South Fayette suit. Accordingly, an order was entered directing South Fayette to file a complaint as an independent civil action and to join as defendants all of the parties in the *Sanders* case. This has been done. Presently before the court are motions filed by ACHA, HUD and the *Sanders* class plaintiffs, all defendants in the instant case ("defendants"), to dismiss the complaint for lack of standing and/or failure to state a claim upon which relief can be granted, and plaintiff's motion for mediation/neutral evaluation and motion to hold action in abeyance.[1] For the reasons set forth below, the defendants' motions will be granted and plaintiff's motions will be denied.

In 1988, Cheryl Sanders and others as class action plaintiffs commenced an action at Civil Action 88–1261 against HUD, the County, ACHA, and the Redevelopment Authority of Allegheny County, seeking to redress the alleged establishment of *de jure* racial segregation in public and other federally assisted housing in Allegheny County and the alleged perpetuation of and failure to remediate that segregation in violation of the United States Constitution and statutes set forth in the complaint. A plaintiff class subsequently was certified consisting of "all black current residents in, or applicants for, public housing assisted by the ACHA and/or HUD, who have been and continue to be denied decent, affordable, and racially integrated public housing opportunities." *See* Opinion and Order, October 15, 1992, Document No. 187, in Civil Action 88–1261. As of December 1994, there were approximately 5,000 members of that class. *Sanders, et al. v. United States Department of Housing and Urban Development, et al,* 872 F.Supp. 216, 218 (W.D.Pa. 1994).

During the course of the litigation, HUD admitted that it had violated the Fair Housing Act, as amended, 42 U.S.C. § 3601, § 3608(e)(5), due to its past failure to administer local federal housing programs in a manner designed to achieve the goals of the

---

1. ACHA also has filed a response and brief in opposition to South Fayette's motion for injunctive relief, contending that each basis advanced in support of the requested relief is without merit as a matter of law or fatally undermined by the record and orders in *Sanders.* The County has submitted a letter indicating that since it has no authority or responsibility in conjunction with the selection and approval of scattered-site units under the *Sanders* Decree, it does not intend to file material in response to plaintiff's pleadings. *See* Document No. 40.

Act and to eliminate the vestiges of discrimination in those housing programs. "In addition, in a Final Investigative Report resulting from a 1991 compliance review of the ACHA, HUD made findings that the ACHA was in violation of Title VI [of the Civil Rights Act of 1964] and the regulations thereunder for the creation and perpetration of racial segregation in its conventional public housing through its site selection, occupancy, waiting list, tenant selection and assignment, transfer, and other policies and practices, and that current and continuing practices perpetuated the intentional segregation practiced by the ACHA prior to 1965." *Sanders,* 872 F.Supp. at 225 (matter in brackets added). In January of 1994, HUD assembled a committee whose members had expertise in HUD's programs to develop a desegregation plan for Allegheny County. *Id.* at 218. That plan served as the basis for the defendants' negotiated settlement agreement. *Id.*

The settlement agreement created by the *Sanders* parties was presented to the court as a Consent Decree ("Decree"). After extensive notice by newspaper publication and approximately 9,455 direct mailings of the provisions of the Consent Decree and of the right to file timely objections thereto, a hearing was held on December 12, 1994. At that hearing only one person appeared to express disapproval of the proposed settlement Decree, and it was approved as the final resolution of the lawsuit. *Id.* at 217–23. The Decree was entered, *inter alia,* with the express approval of the Secretary of HUD ("Secretary") and after the issuance of Executive Order No. 12892 and an accompanying Memoranda of the President, 59 F.R. 2939 and 8513, *reprinted* at 42 U.S.C.A. § 3608.

Although the Decree is designed "to decrease the level of racial spacial separation in federally assisted housing programs and the private housing market in Allegheny County, and to increase desegregative housing choices and opportunities for class members and other low-income persons," its purposes are much broader, and include the improvement of "black communities in which a substantial number of federally subsidized units are sited ... [which] generally have undergone decline and disinvestment." *Sanders,* 872 F.Supp. at 218, 221. The Decree contains nine sections which address the various aspects of the County's federally assisted housing programs in which the discriminatory practices giving rise to the lawsuit and the admission and findings of liability occurred and sets forth directives and standards which are designed to implement and achieve the objectives of the Decree. *Id.* at 218–20. It also provides for the creation of a Task Force whose duties include the responsibility to coordinate the selection and approval of sites for new and replacement units of public housing and to assist HUD in fulfilling the obligations imposed on it under the Fair Housing Act with regard to the County's ongoing housing programs. *Id.* at 227–28.[2] The Decree specifically enjoins the County, ACHA and HUD "to implement the Decree and take all actions necessary to fulfill its obligations." *Id.* at 220. To insure compliance with the Decree, this court has retained jurisdiction for at least seven years. *Id.*

Section III of the Decree provides for the acquisition and siting of 100 units of public housing to replace the units demolished at a previous County public housing site known as Talbot Towers. It provides that these units "and other new or replacement units must be scattered-site housing" placed in certain defined areas of the County in such a way as to provide class members with housing opportunities *outside of racially identifiable and low-income impacted communities.* *Id.* at 218 & 228.

South Fayette's complaint, in effect, seeks to prevent the defendants from complying with these mandates. The complaint sets forth the bases for the relief it seeks in six causes of action: (Count I) deprivation of federal statutory rights; (Count II) violation of public policy—retaliation against plaintiff

---

**2.** The Task Force is composed of representatives of each of the *Sanders* defendants, designees of counsel for class plaintiffs, representatives of the Fair Housing Service Center created under the Decree and other representatives of non-profit and community-based organizations that HUD and class plaintiffs jointly select. *Sanders,* 872 F.Supp. at 228. The Task Force "may not act without the concurrence of the designees of the plaintiff class and the representative of HUD." *Id.* Thus, all Task Force undertakings are reviewed preliminarily by a representative of HUD.

by ACHA; (Count III) violation of the *Sanders* Decree; (Count IV) violation of Pennsylvania's Sunshine law; (Count V) violation of 42 U.S.C. § 1983; and (Count VI) a request for attorneys' fees pursuant to 42 U.S.C. § 1988.

With the exception of Count II, these causes of action are in all material legal and factual aspects identical to those set forth two years ago by the Borough of Edgewood in a complaint which it filed in this court objecting to the placement of up to eight units of public housing in its community. The *Edgewood* complaint was resolved as a matter of law by this member of the court in an opinion and order dismissing all counts of the complaint under Rule 12(b)(6), Fed. R.Civ.P., 28 U.S.C., for failure to state a cause of action upon which relief could be granted in *Borough of Edgewood, et al. v. Henry Cisneros, in his official capacity as Secretary of The United States Department of Housing and Urban, et al.*, Civil Action 96–775 (W.D.Pa. Dec. 20, 1996). That ruling was appealed to the United States Court of Appeals for the Third Circuit and affirmed without written opinion at 129 F.3d 1254 (3d Cir.1997). Accordingly, we rely heavily herein on our affirmed rulings in *Edgewood.*

The *Edgewood* plaintiffs set forth the following bases for their suit: (Count I) violation of the Decree by failing to coordinate the selection of sites for replacement units and failing to complete a study of desegregative sites throughout the county; (Count II) violation of HUD regulations, including 24 C.F.R. § 941.201(c) (requiring cooperation agreements with a local body of government), 24 C.F.R. § 941.404(n) (setting forth certain procedures for submitting proposals to HUD), 24 C.F.R. § 941.501(b) (setting forth regulations pertaining to a housing authority's acquisition of property which HUD allegedly violated by permitting ACHA to obtain an agreement of sale before obtaining final approval from HUD) and 24 C.F.R. § 941.502(d) (setting forth regulations pertaining to the costs of developing public housing and allegedly violated by HUD's failure to determine whether ACHA's estimate of the development costs was reasonable); (Count III) violation of substantive due process through the arbitrary and capricious placement of public housing in disregard of federal statutes and regulations and the plain language of the Decree; (Count IV) improper delegation by HUD of its powers to the representative of class plaintiffs; (Count V) violation of 42 U.S.C. § 1983 by all non-federal defendants; (Count VI) entitlement to attorneys' fees under 42 U.S.C. § 1988; and (Count VII) violation of Pennsylvania's Sunshine Act by ACHA and the County. The *Edgewood* plaintiffs also contended that defendants had failed to complete a plan identifying the sites for the replacement scattered-site units, that defendants improperly were concentrating the units in the East End of Allegheny County in general and the Edgewood Borough in particular, that the units were being placed without acquiring a cooperation agreement with the appropriate local governing body, that the method of obtaining an agreement of sale and then seeking HUD's approval for funding was contrary to the applicable regulations, and that HUD had failed to determine whether ACHA's estimate of the total development costs under the Decree was reasonable and did not exceed HUD's estimate of replacement costs.

The complainants in *Edgewood* further alleged that defendants had not coordinated the selection of the scattered-site replacement units and had "arbitrarily and capriciously lumped eight of the units in Edgewood, a tiny borough which actually borders Braddock Hills and Wilkinsburg, two of the segregated areas which the decree expressly defines as 'impacted' municipalities." *Edgewood* Amended Complaint at ¶ 44. They also alleged that the defendants' failure to develop a comprehensive plan to scatter the replacement sites "throughout the County rather than lumping twenty-three of the sites in a compact geographic area in the East End of Pittsburgh" had resulted in the placement of units in "the least appropriate region of the County in which to pursue desegregative opportunities" for class plaintiffs. *Id.* at ¶ 48.

Finally, as the bases of injunctive relief, the plaintiffs contended that they would be irreparably injured if defendants were permitted to acquire privately owned real estate in Edgewood and convert it into public hous-

ing units because those units would no longer generate property or school tax revenues. They argued that monetary damages would be inadequate and that such damages would be impossible to measure because the loss of revenue would continue indefinitely into the future. They also averred that they would be injured by having to provide reduced municipal services to all residents despite the fact that those residents would continue to pay the same amount of taxes, or, if the borough decided to maintain the same level of services, taxes would have to be increased on all of its residents. Finally, they expressed the fear that the "influx of public housing units [would] depress property values." *Id.* at ¶ 50.

On December 20, 1996, this court issued the opinion and order referred to above dismissing the action with prejudice on the grounds that the *Edgewood* plaintiffs has failed to allege a legally cognizable injury-in-fact or to state a claim upon which relief could be granted. The United States Court of Appeals for the Third Circuit affirmed the order by judgment order on September 25, 1997.

South Fayette is a first-class township in the County of Allegheny and is organized and exists pursuant to Pennsylvania's First–Class Township Code, 53 P.S. § 55101 *et seq.* It is a township of approximately twenty-one square miles located in the southwest corner of the County and as of the 1990 census had a population of 11,313. Complaint at ¶ 1. Situated within the township is the so-called "Morgan Housing Center" ("Morgan"), a public housing project in operation since 1955. Morgan covers approximately twelve acres and consists of twenty buildings. Complaint at ¶ 8. The development originally had 149 units, but currently only fifteen families reside there. *See* Brief of ACHA (Document No. 8) at p. 7. The Morgan property has deteriorated and "ACHA submitted a demolition request for Morgan to HUD some time ago." *Id.*

South Fayette and the ACHA have been at odds concerning the deterioration of Morgan and plans for its demolition since 1992. This dispute resulted in citations and fines totaling $111,000 being levied against ACHA by a Pennsylvania District Justice at the behest of the township on June 4, 1998, followed by a suit brought in this court on June 9, 1998, by ACHA to restrain the collection of those fines. That suit, referred to earlier in this opinion, is pending before Judge Cindrich at Civil Action 98–1005.

On or about June 29, 1998, the *Sanders* Task Force identified six townhouses located in South Fayette and recommended that ACHA purchase the properties under the Decree. Complaint at ¶ 13. On July 22, 1998, counsel for class plaintiffs, not satisfied with the speed with which ACHA and HUD were implementing this recommendation and fearing that these properties would be sold to others if ACHA and HUD did not act promptly, requested that this court enter an order directing ACHA and HUD to comply with their obligations under the Decree and to move forward with the purchase of the six townhouses in South Fayette. After a conference with the *Sanders* parties, this court entered an order on July 27, 1998, directing ACHA to enter into purchase agreements for these properties, contingent upon HUD's approval, without further delay. *See* Document No. 358 at Civil Action 88–1261. Thereafter, in compliance with that order, ACHA entered into purchase agreements for those units. Those agreements and housing units are the subject of this suit. *See* Addendum C to Motion for Injunctive Relief (Document 3).

South Fayette and ACHA *were in the process of settling their dispute* regarding the "Morgan" fines when Township officials became aware of the Task Force's intent to place six replacement units in South Fayette. Without notifying South Fayette, ACHA had made a formal submission to HUD requesting funds to purchase the six replacement units. *See* South Fayette's Brief in Support (Document 4) at p. 10.

South Fayette officials became aware of the purchase proposal on August 10, 1998, when they received an undated letter from HUD informing them of ACHA's intent to purchase the units and inviting comment

from South Fayette.[3] The letter informed South Fayette "that HUD must determine if there is a need for such housing assistance, and if there is, will adequate public services and facilities be available in the area" and invited comments from South Fayette concerning the need for housing assistance and the adequacy of public facilities and services. *Id.* at ¶¶ 17 & 18. South Fayette advised HUD that the notice was undated, whereupon HUD forwarded a second letter to South Fayette dated August 19, 1998. *Id.* at ¶ 20.

On August 17, 1998, South Fayette officials were informed that ACHA already had executed sales agreements for some of the properties and that closing dates were contemplated within thirty days of August 19, 1998. *Id.* at ¶ 22. On September 8, 1998, South Fayette delivered its comments to HUD outlining its objections to the placement of public housing at the proposed sites. *See* Plaintiff's Brief in Support at p. 11. On September 10, 1998, the Task Force met with South Fayette officials regarding South Fayette's concern that sales agreements had been entered into prior to the expiration of the thirty-day comment period. South Fayette alleges that at this meeting the "Township was advised that neither ACHA nor HUD would consider any comments the Township would make and the properties were apparently not selected by ACHA or HUD but were chosen by the *Sanders* Task Force ...." Complaint at ¶ 23. South Fayette filed its answer, counterclaim and motion for injunctive relief at Civil Action 98–1005 on September 11, 1998.

3. In support of its inadequate notice claim South Fayette avers that it was not a party to *Sanders*, nor was it advised by the Task Force prior to August 10, 1998, that any properties within South Fayette were under consideration for purchase or informed of the criteria which the Task Force would use to identify potential sites. Complaint at ¶ 15.

4. The Secretary, for example, notes that "South Fayette has raised almost all of the same discredited causes of action dismissed in *Edgewood v. Cisneros* [and that its] use of this suit to clothe its hostility to public housing is transparent." Secretary's Memorandum in Support (Document No. 12) at p.1. Indeed, the Secretary observes that South Fayette has "exhume[d] most of the causes of action rejected in *Edgewood:*

In the latter part of September HUD forwarded two additional letters to South Fayette notifying it of ACHA's proposal to acquire three additional townhouses in South Fayette, bringing the proposed total number of purchases to nine. On September 30, 1998, HUD's Pittsburgh area office forwarded a letter to ACHA granting "final site approval for the six scattered sites" initially selected in South Fayette. The letter further indicated that based upon HUD's "review of the proposal information submitted, including comments received as part of the local government consultation process," the six scattered-site units were "approved for purchase by the [ACHA], provided good title" could be obtained. *See* Exhibit to ACHA's Response to Court's Inquiry of September 17, 1998 (Document No. 19). On October 1, 1998, this court issued a memorandum and order denying South Fayette's request for an immediate restraining order prohibiting defendants from acquiring the properties within South Fayette, the court finding that acquisition of the properties would not in itself irreparably harm South Fayette, whereas a default in the underlying agreements to purchase by ACHA would "in itself, *inter alia,* cause substantial harm to the *Sanders* program and adversely reflect on the integrity and viability of purchase agreements entered into by ACHA pursuant to the *Sanders* Decree." *See* Document No. 18.

In support of their motions to dismiss, defendants correctly note the substantial similarity of South Fayette's allegations and arguments with those advanced in *Edgewood.*[4] Defendants then essentially contend

- that HUD and ACHA violated three HUD development regulations, 24 C.F.R. §§ 941.404(n), 941.501(b), and 941.502(d), Complaint, Count I, Brief at 24–25;
- That HUD's approval of a cooperation agreement between the County and ACHA violated 24 C.F.R. § 941.201(c), Complaint, Count I & ¶ 21; Brief at 18, 21;
- that the *Sanders* Task Force violated the Decree, Complaint, Count III; Brief at 19, 21–22;
- that ACHA violated the Pennsylvania Sunshine Act, Count IV;
- that HUD and ACHA violated South Fayette's substantive due process rights, Complaint, Count V & ¶ 62;

that South Fayette has not set forth a legally cognizable injury, does not have third-party beneficiary rights under the Decree, lacks standing with respect to the asserted violations of HUD's development regulations and otherwise has failed to state a claim upon which relief can be granted. Defendants also argue that South Fayette's substantive due process challenge should be dismissed because its complaint and briefs fail to set forth any basis which would support the finding essential to this claim; to-wit, that the decision to acquire the townhouses lacked a rational basis. Finally, defendants argue that Pennsylvania's Sunshine Act does not apply to the challenged procedures.

In response South Fayette insists that (1) it has standing to assert a claim for diminution of property values within its jurisdiction, (2) it has a right to enforce the Decree, (3) it has a concrete injury arising from the defendants' undertakings pursuant to the Decree, (4) the purpose of the Fair Housing Act is to assure that placing public housing within its borders will be done only with its approval, (5) the defendants' actions pursuant to the Decree are arbitrary and capricious and in violation of various federal regulations, (6) ACHA's activities in conjunction with the *Sanders* Task Force violate Pennsylvania's Sunshine Act and Right–to–Know Act, (7) the elimination of a portion of its tax base due to the acquisition of public housing within its borders constitutes a taking without compensation and a violation of due process and (8) ACHA has engaged in covert operations in an effort to retaliate against South Fayette.

Despite plaintiff's apparent reliance upon the same theories which this court found to be frivolous and without merit in *Edgewood*, which was affirmed by the United States Court of Appeals for the Third Circuit, this court has provided plaintiff with the opportunity to be submit its own arguments and authorities in support of these adopted theo-

ries. Having now fully considered South Fayette's complaint, its motion for injunctive relief, its brief in support, and its supplemental memoranda of law and brief in opposition, the court finds that South Fayette has failed to demonstrate that adequate grounds to support the relief it seeks exist, and concludes that its reliance upon factual allegations and legal theories substantially similar to those advanced and rejected in *Edgewood* is misplaced.

Plaintiff's allegations and defendants' challenges thereto raise a number of jurisdictional and substantive issues which must be addressed at the outset in resolving the instant motions. The well-settled fundamental doctrines and principles underlying those issues are briefly summarized below.

"Article III of the Constitution restricts the 'judicial power' of the United States to the resolution of 'cases' and 'controversies.'" *UPS Worldwide Forwarding, Inc. v. U.S. Postal Service*, 66 F.3d 621, 625 (3d Cir. 1995), *cert. denied*, 516 U.S. 1171, 116 S.Ct. 1261, 134 L.Ed.2d 210 (1996) (*citing Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 471, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982)). Cases and controversies are restricted to disputes initiated by "a litigant [having] 'standing' to challenge the actions sought to be adjudicated in the lawsuit." *Id.* In order to have standing, a litigant must satisfy the constitutional and prudential components which are required in order to seek redress in a federal court. *Id.* (*citing Wheeler v. Travelers Ins. Co.*, 22 F.3d 534, 537 (3d Cir.1994)).

The three components necessary to satisfy "the irreducible constitutional minimum of standing" have been summarized by the Supreme Court as follows:

First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent,

---

• and that South Fayette is entitled to attorneys' fees under 42 U.S.C. § 1988, Count VI."
*Id.* at 7. The Secretary asserts that the only count from the *Edgewood* litigation not repeated in South Fayette's complaint is that HUD improperly delegated its powers to the representative of

the class plaintiffs. *Id.* at 8. South Fayette does however, in a similar vein, contend that ACHA's discretion has been restrained improperly by this court's order approving the Decree and therefore this court has substituted its judgment for that of the ACHA. *See* Plaintiff's Brief in Support at p. 30–32.

not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of .... Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id.* (*quoting United States v. Hays,* 515 U.S. 737, 742–44, 115 S.Ct. 2431, 2435, 132 L.Ed.2d 635 (1995)).

"In addition to Article III standing requirements, federal courts have developed prudential standing considerations 'that are part of judicial self-government.'" *Id.* (*quoting Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). The prudential standing rules require that:

> (1) a litigant "assert his [or her] own legal interests rather than those of third parties," (2) courts "refrain from adjudicating abstract questions of wide public significance which amount to generalized grievances" and (3) a litigant demonstrate that her interests are arguably within "the zone of interests" intended to be protected by the statute, rule or constitutional provision on which the claim is based.

*Id.* (*quoting Wheeler,* 22 F.3d at 538). "The rules of standing, whether as aspects of the Article III case-or-controversy requirement or as reflections of prudential considerations defining and limiting the role of the courts, are threshold determinates of the propriety of judicial intervention. It is the responsibility of the complainant *clearly to allege facts* demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers." *Bender v. Williamsport Area School District,* 475 U.S. 534, 546 n. 8, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986) (*citing Warth v. Seldin,* 422 U.S. 490, 517–18, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)) (emphasis supplied).

■ Defendants also have moved to dismiss the counts of the complaint pursuant to Fed.R.Civ.P. 12(b)(6), 28 U.S.C., and argue that even if the allegations advanced by plaintiff should survive a standing analysis they nevertheless fail to state a claim upon which relief can be granted. On a motion to dismiss under Fed.R.Civ.P. 12(b)(6) "[t]he applicable standard of review requires the court to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the non-moving party." *Rocks v. City of Philadelphia,* 868 F.2d 644, 645 (3d Cir.1989). Dismissal of a complaint is proper only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 444 (3d Cir.1977), cert. denied, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). The question is not whether the plaintiff will ultimately prevail; instead, it is whether the plaintiff can prove any set of facts consistent with the allegations of the complaint which would show that the plaintiff is entitled to relief. *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir.1994); *In re Meridian Securities Litigation,* 772 F.Supp. 223, 225 (E.D.Pa.1991).

While all factual allegations and the reasonable inferences to be drawn therefrom are to be accepted as true, "a court need not credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss." *Morse v. Lower Merion School District,* 132 F.3d 902, 906 (3d Cir.1997) (citations omitted). In ruling on a 12(b)(6) motion courts consistently have rejected "legal conclusions," "unsupported conclusions," "unwarranted inferences," "unwarranted deductions," "footless conclusions of law" or "sweeping legal conclusions cast in the form of factual allegations." *Id.* at 906 n. 8 (*citing* in support Charles Allen Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (2d ed.1997), *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996) ("while the pleading standard is a liberal one, bald assertions and conclusions of law will not suffice") and *Fernandez–Montes v. Allied Pilots Ass'n,* 987 F.2d 278, 284 (5th Cir.1993) ("Conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss.")).

■ Furthermore, although the focus in assessing a motion to dismiss is on the allegations set forth in the pleadings, "matters of

public record, orders [and] exhibits attached to the complaint" also may be considered. *Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1384 n. 2 (3d Cir.1994) (*citing* 5A Wright & Miller, *Federal Practice & Procedure: Civil 2d,* § 1357; *Chester County Intermediate Unit v. Pennsylvania Blue Shield,* 896 F.2d 808, 812 (3d Cir.1990)). It is well established that courts are permitted to consider matters of which they may take judicial notice, including records and reports of administrative bodies, *Barron v. Reich,* 13 F.3d 1370, 1377 (9th Cir.1994), and publicly available records and transcripts from judicial proceedings "in related or underlying cases which have a direct relation to the matters at issue." *In re American Continental/Lincoln Sav. & Loan Securities Litigation,* 102 F.3d 1524, 1537 (9th Cir.1996) (*citing, inter alia, Henson v. CSC Credit Services,* 29 F.3d 280, 284 (7th Cir.1994)); *accord Pension Benefit Guaranty Corp. v. White Consolidated Industries,* 998 F.2d 1192, 1196–97 (3d Cir.1993), *cert. denied,* 510 U.S. 1042, 114 S.Ct. 687, 126 L.Ed.2d 655 (1994); *Kauffman v. Moss,* 420 F.2d 1270, 1274 (3d Cir.); *cert. denied,* 400 U.S. 846, 91 S.Ct. 93, 27 L.Ed.2d 84 (1970).

■ Plaintiff invokes this court's equitable jurisdiction and seeks equitable relief, thus invoking the court's equitable discretion. The resolution of such requests involve a delicate balance of equitable factors. Requests for injunctive relief are to be resolved on a case-by-case basis. To be entitled to injunctive relief four general requirements must be satisfied: the moving party must (1) produce evidence sufficient to convince the court that in absence of the relief she will suffer imminent irreparable injury; (2) establish a likelihood of success on the merits; (3) demonstrate that granting the relief will not result in greater harm to the other party; and (4) establish that granting the relief will be in the public interest. *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 931, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975); *Campbell Soup Co. v. ConAgra, Inc.,* 977 F.2d 86, 90–91 (3d Cir. 1992); *ECRI v. McGraw–Hill, Inc.,* 809 F.2d 223, 226 (3d Cir.1987) (*citing SI Handling Systems, Inc. v. Heisley,* 753 F.2d 1244, 1254 (3d Cir.1985)). All of the above factors are balanced with regard to any final decision and the strength of any one factor may affect the necessary showing with regard to another. *Marxe v. Jackson,* 833 F.2d 1121, 1128 (3d Cir.1987).

■ However, a clear showing of an imminent irreparable injury is an absolute necessity. *Marxe,* 833 F.2d at 1128 (*citing Moteles v. University of Pennsylvania,* 730 F.2d 913 (3d Cir.), *cert. denied,* 469 U.S. 855, 105 S.Ct. 179, 83 L.Ed.2d 114 (1984) and *A.O. Smith Corp. v. F.T.C.,* 530 F.2d 515, 525 (3d Cir.1976)); *ECRI,* 809 F.2d at 226. "Establishing a *risk* of irreparable harm is not enough." (emphasis supplied). A "clear showing of immediate irreparable injury" is required. *ECRI,* 809 F.2d at 226 (*citing Continental Group, Inc. v. Amoco Chemicals Corp.,* 614 F.2d 351, 359 (3d Cir.1980)). "The 'requisite feared injury must be irreparable —— not merely serious or substantial,' and it "must be of a peculiar nature, so that *money cannot atone for it.*" *Id.* (emphasis supplied) (*citing Glasco v. Hills,* 558 F.2d 179, 181 (3d Cir.1977)). Injunctive relief will not be granted merely to allay the fears and apprehensions or to soothe the anxieties of the parties. Nor will injunctive relief be granted "to restrain one from doing what one is not attempting and does not intend to do." *Campbell,* 977 F.2d at 92 (*citing Continental Group.,* 614 F.2d at 359).

■ Also, plaintiff essentially seeks review under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.,* of HUD's approval of ACHA's acquisition of the six townhouses. The APA provides that a reviewing court "shall hold unlawful and set aside agency action" if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Normally an agency's decision is not reviewable under the APA unless all administrative remedies have been exhausted. *See generally Bethlehem Steel Corp. v. E.P.A.,* 669 F.2d 903 (3d Cir.1982). An exception is made, however, for matters commenced under the court's equitable jurisdiction, 5 U.S.C. § 702, as long as the party invoking the court's jurisdiction "has no other adequate remedy in a court." 5 U.S.C. § 704. In addition, exhaustion will be ex-

cused where there is a showing of imminent irreparable harm or a clear showing of a violation of statutory or constitutional rights. *Bethlehem Steel,* 669 F.2d at 908.

■ Judicial review of agency action is very limited and deferential. *See Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 743–44, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985). An agency's decision generally is "entitled to a presumption of regularity." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). This presumption does not, however, prevent a court from engaging in a probing in-depth review of the agency action at hand. *Id.* In reviewing an agency action, a court is required to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* at 416., 91 S.Ct. 814 In order to meet this standard an agency is required to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Manufacturers Assn. of U.S. v. State Farm Mutual Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). A court is not empowered to substitute its judgment for that of the agency. *Id.* Nevertheless, an agency's decision of "less than ideal clarity" should be upheld "if the agency's path may reasonably be discerned." *Motor Vehicle Manufacturers Assn.,* 463 U.S. at 43, 103 S.Ct. 2856.

■ A federal agency is bound to follow its own regulations. *United States v. Nixon,* 418 U.S. 683, 695–96, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). Failure on the part of an agency to act in compliance with its regulations is fatal to its actions. *Kelly v. Railroad Retirement Board,* 625 F.2d 486, 492 (3d Cir.1980). Likewise, actions which are not undertaken in accordance with the law are null and void. 5 U.S.C. § 706(2)(A); *Frisby v. United States Department of Housing and Urban Development,* 755 F.2d 1052, 1056 (3d Cir.1985). A reviewing court is required to set aside agency action if it finds that such action was taken without consideration of the relevant factors underlying the policies, purposes and goals set forth in the applicable statute. *Frisby,* 755 F.2d at 1057.

■ Finally, it is now settled that a person or entity who was not a party to a prior proceeding resulting in a consent decree may initiate proceedings in a separate action to challenge actions taken pursuant to the consent decree where those actions may support a claim for violation of constitutional rights or other federal law, including the statute under which the consent decree was entered. *See Martin v. Wilks,* 490 U.S. 755, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989).

*As a Matter of Law, the Municipalities of Allegheny County do not Suffer Legally Cognizable Injury by the Loss of Tax Revenues Resulting From A Housing Authority's Acquisition of Private Property*

Like the plaintiffs in *Edgewood,* plaintiff avers that the placement of public housing within its border subjects it to irreparable harm because the public housing units will (1) no longer generate property or school tax revenues, (2) require the Borough to provide additional municipal services on a decreased tax base and (3) decrease the value of the surrounding private property with a corresponding loss in tax revenues. Based upon these assertions, South Fayette contends at each count of the complaint that it will be injured by the reduction of its tax base. Complaint at ¶¶ 28, 30; 39, 40; 50; 55, 56; 61, 63. It asserts that the loss of future tax revenues entitles it to injunctive relief because property owned by ACHA is tax exempt, ACHA has no obligation to make payments in lieu of taxes and this state of affairs will be ongoing. *Id.* at ¶¶ 30; 40; 50; 56; 63. It also argues that it will be required to provide increased municipal services while suffering a decrease in its tax base and that the anticipated decrease of surrounding property values will result in a correlated loss of tax revenues. In other words, South Fayette contends that it has a right to future tax revenues from private property situated within its borders and that a private citizen's decision to sell that property to a county entity whose property is tax exempt by operation of state law when that property is used

in conjunction with a federal program injures the township in a manner which is redressible by judicial order.

The tax revenue injuries asserted by plaintiff do not constitute a legally cognizable injury which confers standing. The six single-family housing units have been acquired by the Allegheny County Housing Authority. ACHA was created under Pennsylvania's Housing Authorities Law, 35 P.S. § 1544(a); *see also City of Philadelphia v. Lead Industries Association*, 994 F.2d 112, 118 (3d Cir. 1993) (a housing authority is a public body, corporate and politic, exercising the public powers of the Commonwealth as an agency thereof). Thus, ACHA is a Commonwealth agency. *See* 35 P.S. § 1550; *City of Philadelphia*, 994 F.2d at 119. ACHA's powers "include all powers necessary or appropriate to carry out and effectuate the purpose and provisions of [the Housing Authorities Law] including ... [the power] to cooperate with any city, county, regional, Federal or other agency[;] to cooperate with and act as agent of the Federal Government for the public purposes set out in [the Housing Authorities Law] in connection with the acquisition, construction, operation or management of any housing project, or part thereof[;] to purchase, ... acquire by gift, grant, bequest, devise, or otherwise, any real or personal property ... from any person, firm, corporation, municipality or government[;] and to own, hold clear, and improve real property." 35 P.S. § 1550(d), (g), (m), & (p).

Once an Authority has acquired property in accordance with the legislative authority just cited, the following applies:

[t]he property of an Authority is declared to be public property used for essential public and governmental purposes and such property of an authority shall be exempt from all taxes and special assessments, except school taxes, of the City, the County, the Commonwealth, or any political subdivision thereof; provided, however, that, in lieu of such taxes or special assessments, an authority may agree to make payments to the City or the County, or any such political subdivision, for improvements, services, and facilities by such City, County or political subdivision for the ben-

efit of the housing project or the persons residing on or occupying such premises, but in no event shall such payments exceed the estimated cost to such City, County or political subdivision of the improvements, services or facilities to be so furnished. 35 P.S. § 1563. Thus, the loss of future tax revenue from an authority's acquisition of property is mandated by state law and reflects Pennsylvania's expressed public policy.

 It follows, therefore, that an authority's acquisition of private property for public housing in accordance with the statutory authority to do so and the concomitant statutory loss of future tax revenue to the affected political subdivision does not *in itself* constitute a cognizable *legal injury* which entitles that political subdivision to obtain judicial relief. It follows that a municipality lacks standing to assert claims for judicial redress based upon this aspect of Pennsylvania's public policy or that it states a claim upon which relief can be granted when it seeks judicial relief for such "injury."

Of course, it would be a different matter if the acquisition of property by an authority was not in accordance with the legislative authority granted to it. But the records in the *Sanders* case which we are entitled to consider in ruling on the defendants' 12(b)(6) motion to dismiss, *see* authorities cited at pp. 593–594, *supra*, conclusively demonstrate that the South Fayette Township townhouse acquisitions by the ACHA were made pursuant to the *Sanders* Decree, were made in cooperation with a federal agency, HUD, and were in response to a specific court order. *See* pp. 590–591, *supra*.

 Furthermore, the contention that placing six or nine single-family scattered-site units within South Fayette will decrease surrounding property values and thus injure South Fayette through the loss of tax revenue likewise does not state a legally cognizable injury or sufficiently state a claim upon which relief can be granted. In addition to the fact that plaintiff has failed even to allege a basis for this assertion and has cited to no law or regulation which protects its claimed interest in future tax revenues under these circumstances, this precisely is the type of

bald contention the court may reject in considering a 12(b)(6) motion to dismiss, *see* discussion *supra* at p. 593, and we do.

Moreover, it is worth emphasizing that plaintiff's asserted injury arises from the defendants' actions undertaken for the purpose of providing decent, safe and desegregated housing pursuant to specific state and federal public policy enactments which are premised on findings that such housing will result in substantial financial and other benefits to all communities, and an order of this court reflecting that policy and a finding that the *Sanders* defendants had failed for years to implement it. In light of the foregoing and the law which exempts such property from the taxing power of plaintiff, it follows *a fortiori* that any secondary loss of tax revenue to plaintiff does not constitute a legally cognizable injury.[5] It thus is clear that as to this claim plaintiff has failed to identify a concrete and particularized legal injury which it will suffer which confers standing on it or which constitutes a claim upon which relief can be granted.

### The Municipalities of Allegheny County Lack Standing to Assert Rights Emanating From the Decree

Similar to the arguments advanced by the *Edgewood* plaintiffs, South Fayette contends that it has standing to challenge the manner in which the Decree is being implemented. On the ground that it is an intended beneficiary of the Decree's provisions requiring scattered-site development, it contends that the Decree gives it the right to resist the placement of public housing within its borders. Specifically, it asserts that the placement of scattered-site housing within its borders will create an improper concentration of public housing there and consequently will not fairly distribute the scattered-site replacement units among the 116 non-impacted municipalities in the County. It also argues that this concentration of units within its borders will deprive class plaintiffs of appropriate desegregative opportunities and will not provide housing which complies with the site-selection criteria established by the Task Force, thus making South Fayette an inappropriate municipality within which to place public housing.

In *Edgewood*, the plaintiffs similarly alleged that the defendants' failure to complete a county-wide comprehensive plan for the balance of the replacement units and their failure to coordinate the selection of the remaining sites had "arbitrarily and capriciously lumped eight of the units in Edgewood, a tiny borough which actually borders Braddock Hills and Wilkinsburg, two of the segregated areas which the Decree expressly defines as 'impacted' municipalities." The *Edgewood* plaintiffs further theorized that "if a study had been conducted, as required by the Consent Decree, defendants would have a coherent plan to scatter the remaining 56 sites throughout the County rather than lumping 23 of the sites in a compact geographic area in the East–End of Pittsburgh," an area which the *Edgewood* plaintiffs asserted was "the least appropriate region of the County in which to pursue desegregative opportunities" for the class plaintiffs. They argued that the Task Force decision to locate replacement units within the borough amounted to an *"ad hoc* approach [which] merely move[d] a number of HUD tenants 'across the street.'" *Edgewood* Amended Complaint at ¶¶ 44, 46, 48.

South Fayette essentially contends in a similar fashion that the Decree creates in South Fayette a right to insist that there be a proportional distribution of public housing units throughout the county and to ensure that the location of public housing best serves the interests of class plaintiffs and the County's housing programs as a whole. It specifically asserts that because Morgan is within its borders and Morgan itself is situated on a census track identified in the Decree as an impacted location where scattered-site units cannot be placed, *all* of South Fayette becomes an "unidentified" impacted community, and, in light of this status, South Fayette has a right under the Decree to insist

---

**5.** Even assuming *arguendo* that the speculative and conjectural aspects of this form of injury could be overlooked and that plaintiff otherwise has standing to seek redress for it, plaintiff has failed to suggest any basis for the proposition that an injury, which by definition is monetary, is irreparable.

that any new or replacement units be located elsewhere. *See* Plaintiff's Brief in Opposition at pp. 5–6.

Similar to the *Edgewood* plaintiffs' argument that the siting of up to eight units in the borough amounted to an arbitrary move across the street, South Fayette also argues that "defendants have violated South Fayette Township's rights under the *Sanders* Consent Decree because they have not fulfilled the duties of the *Sanders* Task Force in selecting sites under the terms of the Consent Decree." Supplemental Memorandum of Law in Support (Document 9) at p. 12. It notes that the Decree at section III.B. requires the Task Force to choose among locations that provide desegregative housing opportunities in accordance with section VIII of the Decree. It points out that the "Housing Opportunities Analysis" section of the Decree provides in part:

> [i]n an effort to better ensure that class members may have housing opportunities in predominantly white neighborhoods which do not have a concentration of assisted housing and that are comparable with the number of housing opportunities in impacted neighborhoods, and/or predominantly white neighborhoods with concentrations of assisted housing, HUD will conduct a study of all assisted housing in Allegheny County. After an analysis of the results of this study, HUD will determine if there is a need to provide additional assisted housing in such neighborhoods to provide the desegregative housing opportunities.

*Id.* at 13 (*quoting Sanders*, 872 F.Supp. at 246).

Although South Fayette acknowledges, contrary to its contention that adequate studies have not been undertaken, that "the Task Force has identified 116 municipalities in Allegheny County which are referred to as 'approved for single family homes purchase and multi-family, mixed financed developments' [and] of that 116, nine include census tracks which are excluded from this approval," it nevertheless argues that because it has "a census track which is excluded from this approval" within its borders, it is "an unidentified impacted community" and therefore

the "spirit" of the Decree "does not contemplate South Fayette Township and the Task Force and ACHA should have excluded South Fayette Township from consideration for having an existing concentration of assisted public housing." *Id.* at 13–14. In other words, South Fayette asserts that a proper analysis by HUD of a study of all assisted housing within the County would have resulted in South Fayette being excluded from consideration for new or replacement housing because the presence of an existing twelve acre housing development (which we note is on the verge of being demolished because both ACHA and South Fayette in effect have found it to be uninhabitable) makes the entire twenty-one square miles of South Fayette a neighborhood containing a concentration of assisted housing.

In addition to the illogic of its argument on this point, based on the law and reason set forth below, plaintiff lacks standing to assert such rights under the Decree for multiple reasons. First, it is a stranger to the Decree and since it is at best only an incidental beneficiary of its provisions plaintiff may not assert the rights of the class plaintiffs to further its interests, which are antagonistic to theirs. Second, it is speculative, to say the least, to assume that a favorable decision would provide plaintiff with redress. Thus, plaintiff's allegations fail to establish an injury-in-fact. In addition, plaintiff's allegations fail to demonstrate that it is within the zone of interests protected by the Decree, which was designed to provide the very type of housing which plaintiff finds to be objectionable.

■■■■ The law in support of the foregoing is well-established. "A consent decree ... is a contract founded on the agreement of the parties." *Vogel v. City of Cincinnati*, 959 F.2d 594, 598 (6th Cir.), *cert. denied*, 506 U.S. 827, 113 S.Ct. 86, 121 L.Ed.2d 49 (1992); *see also Dotson v. United States Dept. of Housing and Urban Development*, 731 F.2d 313, 318 (6th Cir.1984) ("A consent decree ... is ... a contract that has been negotiated by the parties ...."); *Berger v. Heckler*, 771 F.2d 1556, 1564 (2d Cir.1985) (same). The construction of a consent decree is a question of law. *Berger*, 771 F.2d at 1568.

As with other contracts, the intent of the parties is controlling and the agreement is to be construed to preserve the position for which the parties bargained. *Vogel,* 959 F.2d at 598; *see also United States v. ITT Continental Baking Co.,* 420 U.S. 223, 238, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975) (a consent decree is to be construed for enforcement purposes as a contract and in accordance with the parties' intent as reflected within the four corners of the instrument).

 A court "is not entitled to expand or contract the agreements of the parties as set forth in the consent decree ... and the explicit language of the decree is given great weight." *Berger,* 771 F.2d at 1568. Deference is to be given to the plain meaning of language employed and the normal usage of the terms selected by the parties. *Id.* (citing *United States v. Atlantic Refining Co.,* 360 U.S. 19, 22–23, 79 S.Ct. 944, 3 L.Ed.2d 1054 (1959)). Likewise, the circumstances leading to the formation of the consent decree provide the context within which the parties' intent is to be ascertained. *Id.* (citing *ITT Continental Baking Co.,* 420 U.S. at 238, 95 S.Ct. 926).

 It likewise is well established that a third party who is not a party to the contract may assert rights under it only where the instrument demonstrates that the third-party was an intended beneficiary. *Hook v. State of Arizona, Dept. of Corrections,* 972 F.2d 1012, 1014 (9th Cir.1992) (enforcement of consent decrees is governed by the established contract principle that nonparties may enforce an agreement only where they are intended third-party beneficiaries); *see also Rafferty v. NYNEX Corp.,* 60 F.3d 844, 849 (D.C.Cir.1995) (party who is not an intended third-party beneficiary lacks rights to enforce a consent decree); *Aiken v. City of Memphis,* 37 F.3d 1155, 1167 (6th Cir.1994); *Beckett v. Air Line Pilots Assn.,* 995 F.2d 280, 288 (D.C.Cir.1993); *Berger,* 771 F.2d at 1564; *Guy v. Liederbach,* 501 Pa. 47, 459 A.2d 744, 751 (Pa.1983); *Hrushka v. State, Dept. of Public Works and Highways,* 117 N.H. 1022, 381 A.2d 326, 327 (N.H.1977); *County of Nassau v. Owens,* 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979) (considering common law regarding third-party ben-eficiaries in discussion of contract governed by federal law); Restatement (Second) of Contracts § 302 (1979) (setting forth distinction between intended and incidental beneficiaries). In contrast, "[a]n incidental beneficiary is a beneficiary who is not an intended beneficiary." Restatement (Second) of Contracts § 302(2) (1979). Incidental beneficiaries lack standing to enforce a consent decree. *Hook,* 972 F.2d at 1015.

 A two-part test is utilized to determine whether one may claim intended third-party beneficiary status: (1) the recognition of the beneficiary's right must be appropriate to effectuate the intention of the parties and (2) the circumstances must indicate that the promisee intended to give the beneficiary the benefit of the promised performance. *See Guy,* 459 A.2d at 751; *Scarpitti v. Weborg,* 530 Pa. 366, 609 A.2d 147, 150 (Pa.1992) ("A party becomes a third party beneficiary only where both parties to the contract express an intent to benefit the third party in the contract itself ... unless, the circumstances are so compelling that recognition of the beneficiary's right is appropriate to effectuate the intention of the parties and ... the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.").

 "Under settled principles of federal common law, the third party may have enforceable rights under a contract if the contract was made for his direct benefit." *Holbrook v. Pitt,* 643 F.2d 1261, 1270 (7th Cir. 1981). Where, however, a consent decree is entered by the government for the benefit of third parties in general, enforcement of the consent decree generally is limited to the contracting parties because in such circumstances the numerous third-party beneficiaries are assumed to be merely incidental beneficiaries without rights of enforcement. *See Beckett,* 995 F.2d at 288 ("Even if the government intended its consent decree to benefit a third party, that party could not enforce it unless the decree so provided."); Restatement (Second) of Contracts: § 313(2) cmt. a (1981) ("Government contracts often benefit the public, but individual members of the public are treated as incidental beneficia-

ries unless a different intention is manifested."); *Hook,* 972 F.2d at 1015 (third-party beneficiaries of a government contract are assumed to be incidental beneficiaries and are precluded from enforcing it absent a clear intent to the contrary); *Hodges by Hodges v. Public Building Commission of Chicago,* 864 F.Supp. 1493, 1509 (N.D.Ill. 1994)(same); *Rafferty,* 60 F.3d at 849 ("Unless a government consent decree stipulates that it may be enforced by a third party beneficiary, only the parties to the decree can seek enforcement of it."). The well-established correlative rule is that incidental beneficiaries lack standing to enforce a consent decree. *Wang v. Gordon,* 715 F.2d 1187, 1190 (7th Cir.1983); *Moore v. Tangipahoa Parish School Board,* 625 F.2d 33, 34 (5th Cir.1980); *Cicirello v. New York Telephone Co.,* 123 F.R.D. 523, 526 (E.D.Pa.) (denying standing to incidental beneficiary where government consent decree did not contemplate non-party enforcement), *aff'd* 879 F.2d 855 (3d Cir.), *cert. denied,* 493 U.S. 934, 110 S.Ct. 326, 107 L.Ed.2d 316 (1989).

 The stated purpose of the *Sanders* Decree is "to desegregate the ACHA's housing programs, to increase desegregative housing choices and opportunities for class members and other low-income residents of Allegheny County, and to decrease residential racial segregation and racial spatial separation for all residents of the County." *Sanders,* 872 F.Supp. at 226. In furtherance of these objectives, the Decree requires defendants to replace the public housing demolished at Talbot Towers with 100 units of "scattered-site housing." *Id.* at p. 229. The Decree defines a "scattered-site development" as a development of between one and twelve units in an area which is not racially identifiable. *Id.* at 226. The placement of these units is limited to "locations that provide desegregative housing opportunities in accordance with § VIII" of the Decree. *Id.* at 229. Section VIII of the Decree mandates that all replacement and new family public-assisted housing units "be sited outside of impacted neighborhoods and the following municipalities: Braddock, Braddock Hills, Clairton, Coraopolis, Duquesne, Homestead, McKees Rocks, North Braddock, Penn Hills, Rankin and Wilkinsburg." *Id.* at 242. Thir-

ty-four separate census tracks in the County are identified as impacted neighborhoods. *Id.* at 227. It cannot seriously be disputed that the acquisition of the units in South Fayette conforms with all restrictions specifically set forth in the Decree. Thus, as an initial observation it is clear that plaintiff has failed to identify any express provision of the Decree which has been violated by defendants' decision to locate six to nine units in South Fayette.

It likewise is clear that the Decree does not require any comprehensive distribution nor does it mandate that the selection of the site locations be made in such a way as to distribute them equally throughout the non-impacted municipalities or the County's regions. Any such contention is convincingly refuted by the Decree's provision authorizing 44 of the 100 replacement units to be located in Jefferson Borough, a single municipality located in the southern region of the County. No provision of the Decree can be read, as plaintiff would have it, to give them the right to demand that the replacement housing units be distributed in a particular manner among the non-impacted neighborhoods or municipalities comprising Allegheny County or to demand that public housing units be located in some municipality other than their own.

Nor does any provision of the Decree suggest that HUD has delegated any aspect of its expertise or statutory oversight to these County municipalities in conjunction with the process undertaken by defendants to bring the County's federally assisted housing programs *into compliance with federal law.* The parties specifically limited the enforcement of the Decree to the *Sanders* parties and provided that notice of enforcement proceedings was required only to these parties. *See Sanders,* 872 F.Supp. at 243–44. Primary responsibility for overseeing the County defendants' compliance with the Decree and the Fair Housing Act was vested in HUD. *Id.* The Decree provides that the *Sanders* parties may seek to add another entity or person to the action *only for the purposes of enjoining that entity or party from interfering with or frustrating implementation of the Decree.* The *Sanders* par-

ties also specifically contemplated that the County defendants would use their statutory authority to compel municipalities to assist with or refrain from interfering with the implementation process. *See* § III.C.2 and § IX.B & C, *reprinted* at *Sanders,* 872 F.Supp. at 229 & 243–44. In short, no provision of the Decree implies that any municipality will have any rights to claim third-party beneficiary status in conjunction with the scattered-site requirements or the de-segregative housing opportunities to be created by the Decree, nor does any provision of the Decree imply that the municipalities will have a right to dictate how the County's public housing programs will be implemented throughout the County as a whole.

Furthermore, South Fayette's argument that it has been injured by the failure of HUD to analyze properly the assisted housing within the County and to exclude all of South Fayette in the selection of locations for replacement units is speculative, self-serving and illogical. The essence of this claim is that a proper analysis by HUD of all assisted housing in the County *might have revealed* better options for the *Sanders* class plaintiffs. South Fayette has not alleged that any of its regions and communities outside the excluded census track, i.e., the Morgan plan, are impacted economically or racially. Neither does it allege that the location of the units in South Fayette will deny the class plaintiffs the opportunity to live in a neighborhood which is not impacted by race and/or low-income, nor does it allege that the developments where the units are being acquired will be impacted in such a manner by scattering six to nine single-family units in them. Instead, South Fayette merely asserts that locating public housing anywhere within its 21 square miles improperly expands a 12 acre area where public housing has been situated, but, we reiterate, in the near future likely will be abandoned entirely.

Of course, plaintiff may not rely on the rights of the *Sanders* class to support plaintiff's self-serving and rather amorphus notions of what should constitute acceptable concentrations of assisted housing under the Decree. The parties that hold such rights are represented adequately in the process

which resulted in HUD's approval of ACHA's acquisitions. In addition, South Fayette has failed to identify any provision of the Decree which would support an assertion that the placement of scattered units in South Fayette is arbitrary or fails to create desegregative opportunities under the Decree. Bald assertions to the contrary are not sufficient to warrant further proceedings under the present circumstances where the propriety of agency action ultimately is determined by an arbitrary and capricious standard of review.

Accordingly, plaintiff has failed to articulate any theory based on logical probabilities as opposed to optimistic speculation that its asserted injury would be redressed by a decision addressing the propriety of HUD's analysis of the existing assisted housing within the County. In fact, given the deference due to HUD's decisions in the areas of its expertise and the lack of any violation of the restrictions set forth in the Decree, it is highly likely that such a decision would not provide South Fayette with redress.

South Fayette also asserts that there has been a violation of the Decree because the Task Force has failed to assess properly whether the six units comply with the Task Force's site selection criteria. In support of this claim South Fayette references a document South Fayette received at the meeting of September 10, 1998, between the Task Force, HUD, ACHA and South Fayette which reflects certain information considered by the Task Force in site selection. *See* Exhibit B to Plaintiff's Complaint. It argues that the six units in question will not provide class members with adequate public transportation to possible employment opportunities in South Fayette and thus will make it "difficult, if not impossible for anyone living in these areas to find a job and be able to get to and from work on a consistent basis," that the available public transportation will make it difficult for class members to obtain forms of higher education such as night classes at a university or college, that the placement of six families in its jurisdiction will further burden an already crowded public school system, that South Fayette is not conveniently located to a "Pennsylvania Job Center," that "[s]hopping is very scarce in South Fayette

Township," that "there are limited recreational facilities available" and that South Fayette "does not have a hospital at the present time." *Id.* at 15–16.

Assuming, *arguendo*, that South Fayette's concern for the class plaintiffs' quality of life and its self-effacing contention that South Fayette is not an appropriate location for replacement units are genuine, they do not confer standing on South Fayette to seek the extraordinary relief it requests. *See UPS Worldwide Forwarding*, 66 F.3d at 627 ("the first step in satisfying prudential standing is for the litigant to demonstrate that it has asserted its own legal interests rather than those of third parties"); *see also Citizens to Preserve Overton Park*, 401 U.S. at 416, 91 S.Ct. 814 (a court is not authorized to substitute its judgment for that of an agency made in an area of its expertise). There is no basis in law or fact to find that the selection criteria formulated by the Task Force creates rights in South Fayette which it may use to preclude the placement of public housing within its borders.

The purposes, language employed, and enforcement provisions of the Decree indicate clearly that the municipalities of Allegheny County are not third-party beneficiaries of the Decree. The municipalities likewise are outside of the zone of interest sought to be protected by the Decree. South Fayette has failed to set forth factual allegations which demonstrate that it is likely that a decision addressing HUD's analysis of concentrated public housing in conjunction with providing class plaintiffs desegregative housing opportunities would provide South Fayette with redress. South Fayette may not use the rights of parties to the Decree to further its own opposing interests. It follows that South Fayette lacks standing to assert rights emanating from the Decree.

*Plaintiff's Claims Based Upon the Fair Housing Act and the Concomitant Regulations*

Consistent with the plaintiffs' assertions in *Edgewood*, South Fayette devotes considerable effort to resurrecting the proposition that the Secretary and the ACHA violated the United States Fair Housing Act and various HUD regulations in the process of acquiring the units in South Fayette. Plaintiff generally avers that the acquisition of the units was "in violation of the Administrative Procedures Act 5 U.S.C. § 701 *et seq.* and [is] therefore arbitrary, capricious and an abuse of discretion as a deprivation [of] plaintiff's rights under 42 U.S.C. § 1437 *et seq.* and 24 C.F.R. § 941 *et seq.*" Complaint at ¶ 27.

Plaintiff specifically asserts that HUD has failed to provide it with proper notice and a meaningful opportunity to comment on the siting of public housing within its borders. It also avers that defendants have failed to acquire a cooperation agreement with the appropriate body of local government and that they have failed to comply with HUD's development regulations. Defendants argue that even if there was some initial failure by HUD to comply in all technical aspects with the applicable notice requirements, plaintiff was provided with an opportunity to submit comments prior to HUD's final approval and has failed to allege any substantive basis for the proposition that HUD's final approval was improper. Defendants also contend that although plaintiff may arguably have standing to complain about the lack of a cooperation agreement between it and HUD, its allegations nevertheless fail to state a claim upon which relief can be granted and that plaintiff lacks standing to assert rights based upon HUD's development regulations.[6]

Plaintiff seeks to establish a violation of the United States Fair Housing Act, 42 U.S.C. § 1437 *et seq.* The Act's purpose is

---

**6.** In *Edgewood* this court recognized that although the borough's complaints regarding the lack of a cooperation agreement between it and ACHA appeared to meet the minimum threshold necessary to confer standing, the allegations nevertheless failed to state a claim upon which relief could be granted. It likewise recognized that claims challenging defendants' implementation

of the Decree based on HUD's development regulations were akin to generalized complaints concerning the expenditure of tax revenues and that generalized grievances about how an agency conducts its business have long been recognized as inadequate to confer standing. *See Flast v. Cohen*, 392 U.S. 83, 102, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).

to promote the general welfare of the nation by employing its funds and credit ... to assist the several states and their political subdivisions to remedy the unsafe and unsanitary housing conditions and the acute shortage of decent, safe and sanitary dwellings for families of lower income and, consistent with the objectives of this chapter, to vest in local political housing agencies the maximum amount of responsibility in the administration of their housing programs.

42 U.S.C. § 1437. "[T]he intended beneficiaries of the legislation are low-income families who require housing, and it is those classes of persons who fall within the zone of interests sought to be protected by the statute's broad purposes." *Moses v. Banco Mortgage Co.* 778 F.2d 267, 272 (5th Cir.1985); *Vandermark v. Housing Authority of City of York,* 663 F.2d 436, 439 (3d Cir.1981) ("The USHA was enacted for the purpose of assisting political subdivisions in providing decent, safe, and sanitary housing for low-income people."). This is the backdrop against which plaintiff's claims must be considered.

▆▆▆ The municipalities of Allegheny County lack standing to enjoin defendants' activities based upon purported violations of HUD's development regulations. South Fayette specifically alleges that HUD and ACHA violated 24 C.F.R. §§ 941.404(n), 941.501(b) and 941.502(d). As an initial matter the Secretary pointedly observes:

In its haste to follow in Edgewood's misguided footsteps, South Fayette relies on superceded (sic) regulations. In July of 1996, a few months after *Edgewood* was filed, HUD revised its Part 941 regulations. 61 Fed.Reg. 38014. Thus, § 941.404(n), which covered the information a housing authority must submit for a "limited proposal," was eliminated, 61 Fed. Reg. at 38015, and similar requirements

are now imposed by § 941.304. The requirement that HUD determine that the housing authority's estimate of development cost is reasonable, formerly set forth in § 941.502(d), now appears in § 941.306(a). Finally, former § 941.501(b) provided that the housing authority may enter into a purchase agreement upon HUD's approval of the site, and that the purchase agreement must reflect any conditions imposed by HUD. This provision has been superceded (sic) by § 941.401(b), which only provides that the purchase agreement must reflect any conditions imposed by HUD. South Fayette thus cannot rely on § 941.501(b) for the proposition that ACHA can enter into a purchase agreement only after HUD approves the site. *See* Brief at 24.

Secretary's Memorandum in Support (Document No. 12) at 14 n.7. In further response the Secretary contends that South Fayette lacks standing in a number of aspects to raise claims under these development regulations because "it does not have a particularized stake with respect to HUD's and ACHA's alleged violation of these regulations, and therefore is not suffering injury-in-fact [and also] is outside the zone of interests protected by these regulations." *Id.* at pp. 13–14.

The *Edgewood* plaintiffs asserted standing to enjoin the defendants' implementation activities based upon the allegation that ACHA had not submitted a limited proposal to HUD which complied fully with the special procedures specified at 24 C.F.R. § 941.404(n)[7] and that HUD had condoned a violation of its regulations by permitting ACHA to enter into a purchase agreement for the properties and then seek approval of the acquisition, a procedure which they contended was contrary to the provisions of 24 C.F.R. § 941.501(b).[8] They further asserted that

---

**7.** Section 941.404(n) provided:

*Special procedures for HUD/VARTC properties and scattered site projects.* (1) PHAs may, in lieu of submission of a complete proposal described in this section, submit a limited proposal if: ... the proposal is for a project involving the scattered-site acquisition ... and the proposal has been determined to be eligible for front-end funding pursuant to § 941.102(c) or § 941.403(c), and the diversity of ownership

of the properties is expected to make site control difficult.

**8.** Section 941.501(b) provided:

*Purchase agreement.* The PHA upon approval of the proposal, shall exercise its site option and execute a purchase agreement with the owner. The purchase agreement shall reflect any conditions established by the field office ....

ACHA's estimate of the project total development cost had not been determined to be reasonable. They likewise asserted that HUD and ACHA's failure to comply with the applicable regulations constituted action which is arbitrary, capricious and an abuse of discretion.

The Secretary contends that plaintiff has failed to establish the injury-in-fact element as to its claims under HUD's development regulations because it cannot point to "the invasion of a legally protected interest which is ... concrete and particularized." *Id.* at 14 (*quoting Lujan,* 504 U.S. at 560, 112 S.Ct. 2130). The Secretary further argues that plaintiff's generalized complaints arise from an alleged injury to an interest which is held in common by all members of the public and thus plaintiff has failed to identify a personal stake in or a concrete injury arising from HUD's administration of these regulations. *Id.* (*citing Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 220, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974)).

The Secretary specifically points out that plaintiff's argument that HUD has violated 24 C.F.R. § 941.502(d) (now set forth at § 941.306(a) [9]) by assertedly failing to determine whether ACHA's estimate of the total project development cost was reasonable asserts a taxpayer's interest in the spending of government funds, and thus does not confer standing upon South Fayette. With regard to the allegation that ACHA purchased the properties before seeking HUD approval in violation of § 941.501(b) (superseded by § 941.401(B) [10]), the Secretary notes that

plaintiff (1) has failed to indicate how the alleged violation had any unique impact on plaintiff and (2) cannot allege that HUD failed to grant approval for the acquisitions. Finally, with respect to the alleged violations of § 941.404(n) (superseded by § 941.304 [11]), the Secretary notes that South Fayette has not specified which of the numerous requirements ACHA purportedly has violated and points out that its "failure to do so indicates that it views the regulation as nothing more than a regulatory hoop that ACHA and HUD failed to jump through." *Id.* at 16. "This is the sort of generalized grievance that *Schlesinger* and *Flast* held to be insufficient to satisfy Article III's injury-in-fact requirement." *Id.*

Plaintiff lacks standing to complain about a violation of HUD's development regulations. Plaintiff has not been deprived of the ability to develop a proposed project submitted under the regulations. Furthermore, plaintiff has failed to allege with any specificity that it is likely, as opposed to merely speculatively possible, that a decision regarding HUD's administration of the development regulations in conjunction with defendants' implementation activities will provide plaintiff with redress. In addition, there is no merit in plaintiff's contention that the referenced regulation requires actual site approval by HUD *prior* to a housing authority entering into a contingent sales agreement, regardless of whether the regulation is considered in its prior or current version. In short, plaintiff has failed to set forth allegations which confer standing to challenge defendants' imple-

9. Section 941.306 provides in pertinent part:

(a) *Limit on approved HUD funds to Total Development Cost.* No funds provided by HUD pursuant to the Act may be used to pay costs in excess of the TDC without the written approval of HUD....

\* \* \* \* \* \*

(b) *Determination of maximum TDC.* HUD will determine the maximum total development cost (TDC) in accordance with section 6 of the Act. The maximum TDC for a development is calculated by multiplying the number of units for each bedroom size and structure type in the project times the applicable unit TDC limit for the bedroom size and structure type and adding the resulting amounts for all units in the project.
24 C.F.R. § 941.306.

10. This section provides:

(b) *Purchase Agreement.* The purchase agreement shall reflect any conditions established by HUD, such as site engineering studies that must be completed to determine whether the site is suitable for development of the project. 24 C.F.R. § 941.401(b).

11. Section 941.304 provides that each "full proposal" submitted to HUD shall include a project description, description of development method, site information, project costs and similar information to assist HUD with determining whether it can approve a submitted proposal in accordance with all applicable statutory, executive order, and regulatory requirements. *See also* 24 C.F.R. § 941.305(a).

mentation under HUD's development regulations.

*The County and ACHA's Pledge in the Decree to Use Their Legal Authority to Compel the Municipalities of the County to Provide Any Necessary Local Cooperation Satisfied HUD's Regulations and Provided Each Citizen and Entity Within the County With Adequate Notice of the Federal and County Government's Future Undertakings*

In its supplemental memorandum of law and brief in opposition plaintiff relies upon the *Edgewood* theme that it is entitled to relief because ACHA has failed to acquire a signed "local cooperation agreement" from it and that such an agreement is required under 24 C.F.R. § 941.201(c) (now set forth at § 941.201(d)). South Fayette asserts that because it has refused to sign such an agreement since 1992, the decision to place public housing within its borders has deprived it of the ability to be involved in the decisionmaking process and thus resulted in a basis for the injunctive relief which it seeks. Like the plaintiffs in *Edgewood*, plaintiff also asserts that this court's opinion of October 15, 1992, provides support for the position that public housing may not be placed within the borders of a municipality without its expressed agreement to provide any necessary municipal services.

■■■ South Fayette's allegations fail to state a claim upon which relief can be granted. The circumstances underlying the litigation in *Sanders* justified HUD's determination that the County was the appropriate unit of local government to execute a cooperation agreement with ACHA. HUD was justified in relying upon the County and ACHA's pledge of their statutory authority to compel any cooperation necessary from the local municipalities within the County. The notice of the County defendants' intent to exercise their statutory authority in this manner provided each County resident and subdivision with adequate notice of the defendants' agreement to remediate their past discriminatory practices.

Plaintiff asserts more specifically that the lack of a local cooperation agreement between it and ACHA with regard to the six units violates 24 C.F.R. § 941.201(d).[12] It asserts that the purpose of this regulation "is to ensure that local municipalities are on board with respect to public housing projects" and argues that "[b]y permitting an end run around South Fayette Township executing a Local Cooperation Agreement with [ACHA], this purpose was directly frustrated." It further asserts that Congress has expressly recognized it as an entity that should receive assistant from HUD on public housing matters and argues that "HUD has violated various regulations with the effect of frustrating South Fayette Township's ability to promote public housing opportunities." [13]

The expressed purposes of the Fair Housing Act reveal that HUD has complied with its regulations regarding local cooperation agreements. In denying class plaintiffs' motion for summary judgment in *Sanders*, wherein class plaintiffs charged that HUD

---

**12.** Section 941.201(d) provides:

(d) *Local Cooperation*. The PHA must provide a cooperation agreement between the PHA and the applicable local governing body for the area in which the public housing project is to be located as evidence that the local governing body will provide the local cooperation required by HUD pursuant to the Act. This local cooperation shall include exemption from real and personal property taxes, acceptance of PHA payments in lieu of taxes, and the provision at no cost or at no greater cost by the local governing body of the same public services and facilities normally furnished to others in the community.

**13.** The *Edgewood* plaintiffs asserted that HUD had exceeded its authority in approving ACHA's request for assistance in acquiring the Edgewood properties "because ACHA [did] not have a cooperation agreement with Edgewood as required by 24 C.F.R. § 941.201(c)." They further contended that "[a]lthough the Consent Decree states that cooperation agreements are permissible between ACHA and the County, to the extent the Decree relieves ACHA of the obligation to execute a cooperation agreement with Edgewood, it is contrary to the requirements of 24 C.F.R. § 941.201(c) and contrary to the summary judgment decision rendered in the *Sanders* action on October 15, 1992." The *Edgewood* plaintiffs also noted that it is the local government entity which will lose taxes and that defendants had failed to provide it with assurances that ACHA will make payments in lieu of taxes under 24 C.F.R. § 941.201(c).

had abused its discretion and acted contrary to law in refusing to accept a cooperation agreement from the County instead of from the local municipalities in the County, this court observed:

The issue of which local governing body is the appropriate entity under § 1437c(e) when the proposed low income housing is located within the jurisdiction of several local governing bodies has been addressed by only one other court. In a well-reasoned opinion, the United States Court of Appeals for the Sixth Circuit determined that "the Housing Act leaves it up to the Secretary of HUD, exercising reasonable judgment, to determine whether the local housing authority has selected the appropriate unit of local government to give approval." *Newbury Local School District Board of Education v. Geauga County Metropolitan Housing Authority*, 732 F.2d 505, 508 (6th Cir.1984). The court relied on, *inter alia*, the fact that "Congress expressly vested in HUD the discretion to set the level of local cooperation which must be demonstrated before funds can be disbursed ... [and] that [t]hat discretion cannot be appropriately exercised without giving HUD authority over the initial selection of the governing body whose cooperation will be required." *Id.* at 509. Accordingly, the court concluded that "the proper role of the federal courts in this context is to review HUD's determinations according to the traditional scope of review of agency activities, not to choose on an *ad hoc* basis which of several local governments is the right one under the Housing Act." *Id.* at 510. In so concluding, the court rejected the argument that this was a matter of statutory interpretation which had "only one answer." *Id.* at 508–510.

We agree with this reasoning and find that the issue for resolution here is whether HUD's acceptance of ACHA's determination that the municipality was the appropriate entity to enter into a cooperation agreement with under § 1437c(e) was arbitrary, capricious or otherwise not in accordance with the law.

*Sanders* Opinion of October 15, 1992, Document No. 187 at pp. 24–25. In the course of explaining the rationale for granting partial summary judgment in HUD's favor on the cooperation agreement issue, this court noted:

Although the court declines to strike down the ACHA/Borough of Braddock cooperation agreement, this decision should not be interpreted as indicating that ACHA could never under any circumstances, successfully enter into a cooperation agreement with Allegheny County. Such a conclusion is beyond the scope of this opinion.

*Id.* at n. 13.

The *Sanders* Decree itself specifically addressed the issue of cooperation agreements for the public housing to be administered thereunder and authorized ACHA and Allegheny County to enter into a cooperation agreement. For that and the reasons that follow, we find that the Secretary was well within his discretionary authority when he determined that the County's pledge of cooperation and support was sufficient to justify the dispersement of funds.

First, we note that the agreement was in accordance with state law. Pennsylvania's Housing Cooperation Law authorizes a County to enter into the cooperation agreement with a local housing authority. The finding and declaration of necessity section of the Housing Cooperation Law provides:

[i]t has been found and declared in the Housing Authorities Law that there exist in this Commonwealth unsafe and sanitary dwelling accommodations for persons of low income, that these conditions necessitate excessive and disproportionate expenditures of public funds for crime prevention and punishment, public health and safety, fire and accident protection, and other public services and facilities, and that the public interest requires the remedying of these conditions. It is hereby found and declared that the assistance herein provided for the remedying of the conditions set forth in the Housing Authorities Law constitutes a public use and purpose, and an essential governmental function for which public moneys may be spent, and that the provisions hereinafter enacted are necessary in the public interest.

35 P.S. § 1582. The Housing Cooperation Law further provides:

> For the purpose of aiding and cooperating in the planning, undertaking, construction or operation of housing projects located within the area in which it is authorized to act, any State public body may, upon such terms, with or without consideration, as it may determine—
>
> \* \* \* \* \* \*
>
> (d) Enter into agreements, extending over any period, with a housing authority or the Federal Government respecting action to be taken by such State public body pursuant to any of the powers granted by this act; and
>
> (e) Do any and all things necessary or convenient to aid and cooperate in the planning, undertaking, construction, or operation of such housing projects;

35 P.S. § 1584(d) & (e). A "State public body" includes a county. 35 P.S. § 1583(d). Thus, as in *Newbury*, it clearly is the policy of Pennsylvania to promote lower-income housing and, to accomplish that end, Pennsylvania has authorized a county, acting alone, to enter into a binding agreement with HUD and/or a local housing authority. Because the County is capable of making the determination that there is a need to align its lower-income housing programs with federal law and it is Pennsylvania's declared public policy to further the remediation of the conditions identified in the Housing Authorities law, the Secretary's decision to accept a cooperation agreement between the County and ACHA cannot be found to be arbitrary or capricious or outside of any defendants' jurisdiction and legal authority.

In addition, each *Sanders* defendant pledged its legal authority to assure cooperation from the County's municipalities to the fullest extent authorized by law. The Decree provides:

**C. Cooperation Agreements for New Public Housing.**

1. HUD advises ACHA and Allegheny County that, in light of the claims presented in this litigation, based on applicable federal and Pennsylvania law, and the established practice and usage regarding cooperation agreements, Allegheny County is the appropriate unit of government with which the ACHA should enter into such cooperation agreements. Therefore, Allegheny County shall execute cooperation agreement(s), (which term includes one or more non-site specific cooperation agreements), in conformity with regulatory requirements, with the ACHA for the new public housing units called for in this Decree and hereafter developed in the jurisdiction of the ACHA. Such cooperation agreement(s) shall not obligate the County to (i) provide any municipal service not otherwise provided by the County, (ii) exercise any municipal function not exercised by the County, or (iii) enforce any municipal obligation.

2. If the sites selected for new public housing are in municipalities that do not voluntarily enter into cooperation agreements with the ACHA for the construction of the new units, the ACHA may, with the assistance of the parties hereto, seek to obtain cooperation agreements from those municipalities. In the event any municipality that is not a party to such a cooperation agreement refuses to extend the necessary or appropriate cooperation in the development or acquisition of the new public housing units or refuses to provide services to a development:

a. The ACHA shall take all appropriate action to enforce the obligations imposed by law;

b. HUD may initiate appropriate action against the municipality, including, but not limited to, the withholding or conditioning of federal funds or the commencement of a Secretary-initiated complaint under the Fair Housing Act; and

c. Any party to this action may initiate any appropriate proceedings to secure enforcement of this Decree under federal or state law consistent with the provisions of section IX, below.

*Sanders,* 872 F.Supp. at 229.

Under these circumstances, plaintiff has failed to identify any legal basis which undermines the Secretary's determination that Allegheny County was an appropriate unit of local government to enter into a cooperation

agreement, nor has it demonstrated that the authority vested in the County, ACHA and HUD cannot be used to bind South Fayette or any other municipality to abide by the agreements of the County and ACHA where they have acted within their areas of legislative jurisdiction in furthering the County's housing programs as a whole. Plaintiff likewise has failed to demonstrate how ACHA's and the County's representation of the municipalities in the context of county-wide programs was outside of or beyond the County and ACHA's jurisdiction and legal authority. It follows that the Secretary adequately has complied with 42 U.S.C. § 1437c(e) and its accompanying regulation at 24 C.F.R. § 941.201(d). Accordingly, plaintiff's allegations as to the lack of a cooperation agreement fail to state a claim upon which relief can be granted.

Moreover, even if it were assumed that South Fayette had a right to compel any economic benefits it might receive under an additional cooperation agreement between it and ACHA, such a right would not authorize the equitable relief here requested. At best, any such claim would reduce to one for monetary damages and could only be considered after all applicable administrative remedies have been exhausted. Plaintiff, however, does not seek the benefit of a cooperation agreement in this lawsuit; instead, it appears to take the position that it may just say "No" as to any such agreement and by that simple device frustrate the implementation of the important public policies established by the General Assembly of the Commonwealth of Pennsylvania and the Congress of the United States. With that proposition we cannot agree.

South Fayette next asserts that because the purpose of the Fair Housing Act is to "assist the several states and their political subdivisions" in providing adequate housing conditions for low-income individuals and HUD's regulations at 24 C.F.R. § 941.201(d) require the housing authority to have a cooperation agreement between it and "the applicable local government body for the area in which the public housing project is to be located ... [,]" the state law which provides the county and ACHA with the authority to

enter such agreements and bind the subdivisions within their jurisdiction somehow has been preempted by federal law. *See* Plaintiff's Brief in Opposition at p. 18 ("Because of the federal preemption the state statute must fail."). Plaintiff further argues:

The purpose of 24 C.F.R. § 941.201(d) is to ensure that local municipalities are on board with respect to public housing projects. By permitting an end-run-around South Fayette Township executing a local cooperation agreement with [ACHA], this purpose was directly frustrated. Furthermore, South Fayette Township is a political subdivision which Congress has stated should receive assistant from HUD on public housing matters. Instead, HUD has violated various regulations with the effect of frustrating South Fayette Township's ability to promote public housing opportunities. Accordingly, South Fayette Township has a private right of action against HUD.

*Id.* at pp. 18–19. While South Fayette's "ability to promote public housing opportunities" cannot be minimized, these arguments fail to provide a basis for the relief requested here.

There is authority which provides that the purposes of the Fair Housing Act cannot be interpreted to provide a recipient of public housing with substantive rights to compel public officials to provide public housing in particular suburban neighborhoods or to compel them to plan for, approve and promote a particular distribution of public housing. *See Jaimes v. Toledo Metropolitan Housing Authority*, 758 F.2d 1086, 1103 1092–1101 (6th Cir.1985) ("the purpose is not to impose an obligation to place low-income housing in a municipality absent its consent"). There also is authority which provides that a municipality's rights to control public housing within its jurisdiction must give way to the extent reasonably necessary to comply with a recipient's rights under the equal protection clause and the Fair Housing Act. *See Smith v. Town of Clarkton, N.C.*, 682 F.2d 1055, 1069 (4th Cir.1982). It is indeed a different situation here, however, where the Secretary has determined that County federal housing programs are not in

accordance with federal law due to past discriminatory practices and seeks to eradicate the effects of those practices with the regional entities responsible for administering local housing programs on a County-wide basis.

The flaw in South Fayette's argument is that § 941.201(d) does not in itself give South Fayette a substantive right to refuse to cooperate with the County, ACHA and HUD in conjunction with the County's public housing programs. The § 941.201(d) criteria required to justify the Secretary's expenditure of funds are present in the Commonwealth of Pennsylvania through the operation of state law. A housing authority's property is not subject to taxes under Pennsylvania law. 35 P.S. § 1563. Furthermore, a housing authority has discretion under the Housing Authorities Law in determining whether a particular local political subdivision should receive state or federal funds in lieu of such taxes. *See* 35 P.S. § 1563 (... an authority *may* agree to make payments to the city or the county, or any political subdivision for ... services, and facilities by such city, county or political subdivision *for the benefit of a housing project or the persons residing on or occupying such premises* ....)(emphasis added). An authority also has the legislative authority "[t]o arrange with ... any county, city or municipality of the state, to the extent that it is within the scope of their respective functions—(1) *to cause* the services customarily provided by each of them to be rendered *for the benefit of such housing authority, or the occupants of any housing projects of the Authority* ...." 35 P.S. § 1550(j). Finally, even if the local municipality has not received a cooperation agreement from the housing authority, it is not relieved of *its duty* to provide the

occupants of the public housing unit with the services it customarily provides to its residents without a service fee. 35 P.S. § 1585.[14] South Fayette has not identified any such service it provides which is not paid for by tax revenue and for which it otherwise charges a customary fee. Because the County and ACHA could be assumed to have the ability to provide or compel from a local municipality within their jurisdiction the local cooperation necessary for the approval of funds by operation of applicable state law, the Secretary did not abuse his discretion in determining that the requirements necessary for the approval of funds under § 941.201(d) were satisfied. It follows that South Fayette cannot as a matter of law demonstrate that it has a substantive right to the benefits of any such agreement under the circumstances. For these reasons as well, plaintiff has failed to state a claim upon which relief can be granted.

### South Fayette's Claim of Improper Notice Likewise Fails to State a Claim Which Will Support the Relief Requested

South Fayette contends that by entering into agreements of sale for the properties within South Fayette prior to South Fayette's receipt of notification or an opportunity to comment on the need for public housing within its borders, defendants have rendered the thirty-day comment period set forth at 24 C.F.R. § 791.303(b)(2) "a nullity" and have deprived South Fayette "of its [42 U.S.C. § 1439] right to comment before a decision is made to acquire public housing." Complaint at ¶ 26. This is alleged to be in violation of the Administrative Procedures Act, 5 U.S.C. § 701 *et seq.* and "therefore arbitrary, capri-

---

14. *This subsection provides:*

In connection with any housing project, located wholly or partly within the area in which it is authorized to act, any city, borough, town, township or county may contract with a housing authority or the Federal Government with respect to any sums which the housing authority or the Federal Government may agree to pay during any year or period of years to the city, borough, town, township or county for the improvements, services, and facilities to be provided by it for the benefit of said housing project, or the persons residing on or occupying such premises; but in no event shall the

amount of such payments exceed the estimated cost to the city, borough, town, township or county of the improvements, services of facilities to be so supplied: *Provided, however, That the absence of a contract for such payments shall in no way relieve cities, boroughs, towns, townships, and counties from the duty to furnish, for the benefit of said housing project and the persons residing on or occupying said premises, customary improvements and such services and facilities as cities, boroughs, towns, townships, and counties, respectively, usually furnish without a service fee.*

cious and an abuse of discretion as a deprivation [of] plaintiff's rights under" the Fair Housing Act and the concomitant regulations.[15]

In its brief South Fayette explains that its "first notice" of the decision to acquire housing units within its borders was an undated letter from the regional director of HUD received on August 10, 1998. After South Fayette complained, a follow-up letter dated August 19, 1998, was forwarded to South Fayette. Both letters advised South Fayette of the possible siting of public housing and invited it to comment and offer information pertaining to the "proposal submitted by the [ACHA] for housing assistance." South Fayette asserts that because the Task Force already had made a decision to place units in South Fayette, any objections South Fayette forwarded to HUD merely were a perfunctory undertaking and that South Fayette officials essentially were informed that South Fayette's comments would not result in HUD failing to grant approval to ACHA's request for acquisition of the six units.[16]

Plaintiff's allegations fail to state a claim upon which relief can be granted for a number of reasons. First, while subsection (a) of 42 U.S.C. § 1439 does provide for a thirty-day notice to a municipality where the purchase of public housing has been proposed, subsection (b) exempts from the notice requirements of subsection (a) "applications for assistance involving 12 or fewer units in a single project or development." 42 U.S.C. § 1439(b). Thus, there is no statutory basis for plaintiff's improper notice claim. Second, to the extent plaintiff relies on HUD's regulations to support this claim, plaintiff's contention that it was not given an opportunity to submit comments to HUD prior to HUD's final approval of ACHA's proposal conclusively is rebutted by South Fayette's pleadings and the record. ACHA's purchase agreements were contingent upon

HUD's final approval. *See* Addendum C to Motion for Injunctive Relief. HUD provided South Fayette with an August 19, 1998, letter inviting its comments. South Fayette admits that it submitted its comments to HUD on September 8, 1998. HUD did not provide final approval for ACHA's acquisition of the units until September 30, 1998. *See* Exhibit to Allegheny County Housing Authority's Response to Court's Inquiry of September 17, 1998 (Document No. 19). In the September 30, 1998, letter the director of HUD's regional office of public housing informed ACHA that

> [b]ased on our review of the proposal information submitted, including comments received as part of the local government consultation process, the following properties are approved for purchase by the [ACHA], provided good title can be obtained . . . .

Thus, the record unequivocally demonstrates that South Fayette received notice and had an opportunity to and did comment prior to HUD's final approval of the sites in question.

Furthermore, South Fayette has failed to identify any substantive basis for an inference that the acquisition of the units violated any provision of the regulations governing the acquisition. South Fayette's opposition thereto as reflected in its "attendant and additional concerns" raised to ACHA, see Brief in Support at pp. 13–14, as well as its arguments before this court merely reflect South Fayette's assessment that the proposed units will not serve adequately the needs of class plaintiffs. This and its legally irrelevant disproportionate-burden arguments based upon vague assertions regarding the units which currently are or could be used at Morgan, dramatically illustrate the wisdom of the scattered-site concept and the compelling need for defendants expeditiously to move forward with implementation of the *Sanders* Decree. In any event, there is no

---

15. Apparently as one of its bases for finding arbitrary action, South Fayette makes the assertion that "[t]he acquisition of these units is unnecessary to satisfy any need for public housing in the Township of South Fayette because Morgan is not fully occupied at this time." Complaint at ¶ 29. In view of the fact that South Fayette seeks to have Morgan demolished be-

cause of its deterioration and uninhabitable condition, this assertion is, indeed, remarkable.

16. This contention is not raised in plaintiff's complaint. Instead, conclusory allegations to this effect are set forth in its supplemental memorandum of law (Document No. 9).

factual basis supporting South Fayette's contention that it did not receive notice to which it legally was entitled and the opportunity to comment prior to HUD's final approval.

*Plaintiff's Contention that it Has Standing Beyond That Recognized Above is Misplaced and Unavailing.*

██ Plaintiff next argues that as a local municipality adversely affected by defendants' activities and required to shoulder part of the burden of providing class plaintiffs with a remedy, it must have standing to challenge defendants' activities under the Decree and the Fair Housing Act. It also asserts that because it apparently has standing to complain of HUD's notification procedures and the lack of a cooperation agreement between it and ACHA, it should be recognized as having standing to challenge defendants' implementation under all provisions of the Fair Housing Act, the Community Development Act, 42 U.S.C. § 5301 *et seq.*, and the Decree.

In addition to the purported injuries addressed above, South Fayette contends that the placement of public housing within its borders gives rise to an aesthetic injury because the housing will impair the value of the homes located nearby and result in a further diminution of tax revenues and that this likelihood of economic and non-economic injury in conjunction with the burden of providing additional municipal services provides South Fayette with standing to challenge HUD and ACHA's placement decisions. In its supplemental memorandum plaintiff argues that *Lower Moreland Homeowner's Association v. Department of Housing and Urban Development,* 479 F.Supp. 886 (E.D.Pa.1979), recognized a homeowners association's standing to challenge HUD's financing of a proposed senior citizens' high-rise based upon the impact the project would have on the surrounding neighborhood and that the present situation gives South Fayette similar rights. There, the court recognized "the likelihood of economic injury" based on allegations by a homeowners association that the annual allotment the developer proposed to pay in lieu of property taxes would be inadequate to defray the cost of municipal services which the high-

rise facility would require. The court also recognized the likelihood of an aesthetic injury from the construction of a four-story apartment building in an area dominated by single-family homes and the severe traffic congestion which likely would be created in the neighborhood. The court held that these interests arguably were within the zone of interest protected by the Housing and Community Development Act of 1974, thus providing the homeowners association with standing to challenge HUD's approval of the high-rise. *Id.* at 896.

Plaintiff's reliance upon the *form of injury* which gave rise to the recognition of neighborhood standing in *Lower Moreland Homeowner's Association* is misplaced. *Lower Moreland Homeowner's Association* involved the construction of a four-story senior citizens' high-rise in a residential neighborhood consisting of single-family homes, a project the court found was "significantly out of character with the surrounding neighborhood." *Lower Moreland Homeowner's Association,* 479 F.Supp. at 892. Here, the acquisitions in question involve *existing units.* These acquisitions do not require any new construction or changes to existing buildings, and there is no contention that any is contemplated. Furthermore, plaintiff advances no bases other than its dislike of public housing as such and its apparent distrust of ACHA to support the allegation that housing low income families in six to nine scattered-site single-family units already located within the 21 square miles which comprise South Fayette's borders will change the character of its neighborhoods. In ruling on a 12(b)(6) motion to dismiss, we may reject such bald unsupported assertions. *See* Discussion re Rule 12(b)(6) motions, *supra,* p. 593.

In its brief in opposition, plaintiff further asserts that the United States Courts of Appeals for the Third and Seventh Circuits have recognized that community residents are within the zone of interest sought to be protected by the United States Housing Act and have recognized standing on behalf of individuals who were affected by particular programs of community improvement. Plaintiff cites *Shannon v. United States Department of Housing and Urban Devel-*

*opment,* 436 F.2d 809 (3d Cir.1970), and *Alschuler v. Department of Housing and Urban Development,* 686 F.2d 472 (7th Cir. 1982), for the proposition that the Congressional purpose in amending the United States Housing Act in 1970 was "to develop and maintain stabile, desirable urban communities" and asserts that recognition by the courts in those cases of the plaintiffs' standing to challenge HUD's approval of large-scale housing projects provides precedent for the recognition of plaintiff's standing to challenge defendants' implementation of a court Decree in this case.

*Shannon* and *Alschuler* provide no support for plaintiff's assertion that a municipality within which single-family housing units are located is within the zone of interest protected by the United States Housing Act and thus has standing to challenge the proposed *use for low income housing* of six to nine of those units of *preexisting* single-family dwellings located within its borders. The proposition advanced stands that Act and the courts' holdings in those cases on their heads. Both *Shannon* and *Alschuler* recognized that communities may be injured in a concrete manner *where large-scale public housing projects are being placed in an area which already has a high concentration of low income and minority residents. In such circumstances the neighborhood residents (and perhaps the affected municipality) may be within the zone of interests protected by the provisions of the Fair Housing Act,* particularly 42 U.S.C. § 3608(e)(5), and Title VI of the Civil Rights Act of 1968, the very provisions of which gave rise to HUD's admitted liability in *Sanders* and HUD's finding that the County defendants also had violated Title VI of the Civil Rights Act of 1968 by perpetuating and failing to remediate the racial segregation created by the concentration for over thirty years of low income housing in many

of the County's federal housing programs. The injuries in *Shannon* and *Alschuler* specifically were recognized in conjunction with HUD's alleged failure to consider demographic and sociological data in relation to the potential of the projects to impact further on already racially and economically impacted neighborhoods.[17] However, neither court held that the placement of public housing within a community *in and of itself* gave rise to redressible injury, and no court to our knowledge has held that the mere placement of low income families in up to nine units of such housing scattered throughout a 21–square mile community in order to effectuate the very purposes of the Fair Housing Act, did so.

South Fayette does not assert that HUD has failed to take into account the relevant racial and demographic information in determining which areas of the county are appropriate for the location of scattered-site housing. Instead, plaintiff simply asserts that HUD has failed to apply correctly the appropriate criteria in considering whether public housing should be located in South Fayette because South Fayette has borne the burden of having Morgan situated within its borders since 1955 and, in light of the fact that 12 acres within South Fayette is identified as an excluded census track (the Morgan area, which as noted earlier herein is slated for demolition), the entire 21 square miles of the Township should be considered as an "unidentified" area with a concentration of public housing. Plaintiff does not aver that any of the areas where an existing single-family unit will be used for low income housing is or will thereby become a low-income impacted neighborhood. In fact, other than its apparent belief that placing low income families in public housing units within its borders constitutes an injury *per se* and thereby creates

---

**17.** Other courts, including this court in *Sanders,* likewise have recognized neighborhood standing where the alleged injury is premised in part on administrative action which fails to account for the potential to promote racial segregation in public housing programs. *See Glendale Neighborhood Association v. Greensboro Housing Authority,* 901 F.Supp. 996, 1000 (M.D.N.C.1995) (recognizing neighborhood standing where the plaintiffs alleged that a housing project would result in the creation of a segregated neighbor-

hood in violation of the affirmative duties imposed under the Fair Housing Act); *Jackson v. Okaloosa County, Florida,* 21 F.3d 1531 (11th Cir.1994) (recognizing neighborhood residents' standing to challenge HUD's actions as maintaining and exacerbating a pattern of segregated residential public housing). *Mountain Side Mobile Estates v. Secretary of HUD,* 56 F.3d 1243, 1249 (10th Cir.1995) (recognizing neighborhood residents' standing to complain about discriminatory housing practices).

standing in it to complain in general of defendants' activities, plaintiff has failed to identify any basis for its contention that the character of neighborhoods in its municipality will change by scattering within them six to nine low-income housing units. Under these circumstances, plaintiff's attempt to analogize its perceived injury with the type of injury recognized as conferring neighborhood standing in *Shannon* and *Alschuler* is misguided and is rejected.

Further, as stated above, the *Sanders* Decree was entered and is being implemented by the defendants in an effort to remediate the effect of discriminatory housing practices which existed in the County for over thirty years as a result of governmental practices and indifference. The *Sanders* record is replete with references to efforts made by the defendants to obtain the demographic and sociological information necessary to enable them to define and locate desegregative housing opportunities (and thus to eradicate and avoid in the future the very conditions which gave rise to the standing recognized in *Shannon* and *Alschuler*). And it is clear from that record as well that this data has been taken into consideration in the decision to utilize single-family units at scattered sites to eliminate segregation in public housing and in identifying the appropriate neighborhoods to be considered in placing those units. *See, e.g., Sanders,* 872 F.Supp. at 226–27 and 242–243; HUD's Annual Reports on Implementation Activities, (Document Nos. 287, 322 & 363); Report of the *Sanders* Task Force (Document No. 364). In view of the composition of the Task Force and the genesis and stated purposes of the *Sanders* Decree, it is inconceivable that the Task Force would create an environment which would violate the very provisions of the Fair Housing Act. In view of that and the recited record in *Sanders,* we properly reject as unfounded South Fayette's bare assertions that the scattered placement of six or nine low-income housing units within its 21 square mile area and outside of the excluded 12–acre census track will somehow create an inappropriate area of concentrated public housing within its borders. In any event, these allegations do not confer upon it standing to advance generalized grievances under the United States Housing Act or the Community Development Act or the *Sanders* Decree.

*Defendants' Implementation of the Decree Does Not Violate a Municipality's Fifth or Fourteenth Amendments Rights*

South Fayette contends that ACHA and HUD have respectively acted under color of state and federal law and deprived South Fayette of its "constitutional and statutory rights through the enactment and application of unconstitutional policies, practices and customs." Complaint at ¶ 59. South Fayette advances a number of propositions which center around the contention that denial of due process has occurred. It avers that ACHA and HUD have violated the Fourteenth Amendment by entering into agreements of sale before permitting the Township to exercise its right to comment on ACHA's proposal and by refusing to consider South Fayette's comments. *Id.* at ¶ 60. It also avers that ACHA and HUD have engaged in "irrational and arbitrary governmental actions in violation of the Fifth Amendment to the United States Constitution by depriving the Township of real property taxes" and that "placing several units of public housing in a single, small municipality that has vacant public housing units was unreasonable, arbitrary, capricious and irrational." *Id.* at 62.

These allegations fail to state a claim upon which relief can be granted for a number of reasons. First, it has long been recognized that in order to pursue a due process claim one must have a property interest protected by the Fifth or Fourteenth Amendment. *See Taylor Investment, Ltd. v. Upper Darby Twp.,* 983 F.2d 1285, 1292–93 (3d Cir.), *cert. denied,* 510 U.S. 914, 114 S.Ct. 304, 126 L.Ed.2d 252 (1993) (in order to prevail on a substantive due process claim, a plaintiff must demonstrate that it was deprived of a protectable property interest by an arbitrary and capricious act; in order to prevail on a procedural due process claim, a plaintiff must demonstrate that it was deprived of a protectable property interest). The property interest asserted must be one which is encompassed by the Fifth or Fourteenth Amendment. *Acierno v. Cloutier,* 40 F.3d 597, 616 (3d Cir.1994) *(quoting Mid-*

*night Sessions, Ltd. v. City of Philadelphia,* 945 F.2d 667, 679 (3d Cir.1991), *cert. denied,* 503 U.S. 984, 112 S.Ct. 1668, 118 L.Ed.2d 389 (1992)); *see also Chicago, B. & Q.R. Co. v. Chicago,* 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897) (the Fourteenth Amendment made the Fifth Amendment applicable to the states). Substantive due process protection generally is limited to fundamental property interests. *DeBlasio v. Zoning Bd. of Adjustment for Twp. of West Amwell,* 53 F.3d 592, 599–600 (3d Cir.), *cert. denied,* 516 U.S. 937, 116 S.Ct. 352, 133 L.Ed.2d 247 (1995).

■ The Supreme Court long ago recognized that:

> [p]roperty interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules and understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *see also Phillips v. Washington Legal Foundation,* 524 U.S. 156, ——, 118 S.Ct. 1925, 1929, 141 L.Ed.2d 174 (1998) ("Because the Constitution protects rather than creates property interests, the existence of a property interest is determined by reference to 'existing rules or understandings that stem from an independent source such as state law.' "). Thus, when analyzing due process claims "courts are required to turn to state and local law to determine whether the plaintiff possessed a property interest which was abrogated by the governmental action." *Acierno v. Cloutier,* 40 F.3d 597, 616. Here, plaintiff asserts a right to future tax revenue, a right which, as we demonstrated earlier, does not exist as a matter of public policy under Pennsylvania law. Plaintiff's reliance upon *Matagorda County v. Russell Law,* 19 F.3d 215 (5th Cir.1994), for the proposition that a local government body's ability to tax is recognized as a property interest is unavailing. There, the property interest recognized was the County's right to collect taxes

which already had arisen by operation of state law and resulted in a lien attaching to real property. *Id.* at 217. Plaintiff does not seek to vindicate its right to collect past taxes which have accrued under operation of state law; instead, plaintiff seeks to avoid the expressed public policy of Pennsylvania which eliminates plaintiff's very right to impose most real estate taxes on property held by housing authorities and used in furtherance of a statutorily declared public policy. Under these circumstances plaintiff has failed to identify a property interest which is protected by either the Fourteenth or Fifth Amendment.[18] Accordingly, South Fayette's contentions that defendants have deprived it of due process by failing to provide adequate notice or by engaging in arbitrary and capricious action by selecting South Fayette as a location for the placement of public housing are without merit.

### South Fayette's Claim of Retaliation Factually Is Unsupportable

■ Plaintiff's assertion that ACHA has engaged in covert actions in order to retaliate against it is specious for a number of reasons. First, as we indicated earlier in this opinion at pages 590–591, *supra,* the record in *Sanders* conclusively demonstrates that the acquisitions in South Fayette by ACHA were undertaken as a result of decisions by the Task Force and a *specific order of this court* entered on class plaintiffs' motion for interim relief seeking an order compelling ACHA and HUD to comply with their obligations under the Decree. *See* Class Plaintiffs' Motion for Interim Relief (Document No. 359) at Civil Action 88–1261. That motion indicated that eight townhouse properties in South Fayette, Ross and Robinson Townships initially were identified on June 29, 1998, *by the Task Force* and proposed for acquisition on July 9, 1998, and further indicated that contrary to past practice, (and to plaintiff's assertion that ACHA *sought to acquire* the properties in retaliation) ACHA had refused to enter into contingent purchase agreements for these properties. Class plaintiffs requested an order ("requir-

---

**18.** Plaintiff's takings clause claim fails for the same reason. *See Phillips,* —— U.S. at ——, 118 S.Ct. at 1934 (the first issue in assessing a tak- ings clause claim is determining whether the interest asserted is property within the meaning of the Fifth Amendment).

ing the ACHA to immediately enter into purchase agreements for [the units] ... and to enter into purchase agreements as units become available in the future ...."). Second, ACHA, although a member of the Task Force, does not possess the authority to control or dictate the decisions of the Task Force. *See Sanders,* 872 F.Supp. at 228. Furthermore, South Fayette essentially admits in its briefs *that it has no evidence to support its claim of retaliation other than the fact that the identification of the properties by the Task Force followed South Fayette's levying of fines against ACHA. See* Plaintiff's Brief in Opposition at p. 29. The Decree and the record in *Sanders* make clear that ACHA could not have retaliated against South Fayette in the manner alleged because replacement units are selected by the Task Force as a whole, subject to the concurrence only of the representatives of HUD and class plaintiffs.[19] The record in *Sanders,* upon which we may rely in ruling on a motion to dismiss, thus conclusively demonstrates that plaintiff has failed to state a claim upon which relief can be granted on the retaliation claim.

#### *Pennsylvania's Sunshine Act Does Not Regulate the Task Force*

South Fayette's assertion that it is entitled to relief based upon violations of Pennsylvania's Sunshine Act, 65 P.S. § 271 *et seq.,* also is without merit.[20] The Sunshine Act provides that "[o]fficial action and deliberations by a quorum of the members of an agency shall take place at a meeting open to the public" unless various exceptions exist. 65 P.S. § 274. "Official action" is defined as the establishment of policy by an "agency." 65 P.S. § 273. The term "agency" is defined as

> [t]he body, and all committees thereof authorized by the body to take official action or render advice on matters of agency business, of all the following: ... the executive branch of the government of this Commonwealth, including ... any board council, authority or commission of the Commonwealth or of any political subdivision of the Commonwealth ... created by or pursuant to a statute which declares in substance that the organization performs ... an essential government function and through the joint action of its members exercises governmental authority and taxes official action.

*Id.*

■ The Task Force is not a "body" of an "agency" as defined in the Act. The Task Force is not a creature of the Commonwealth of Pennsylvania, nor was it created by a Pennsylvania statute. The Task Force does not establish state policy nor implement or interpret state law. It likewise does not perform essential state governmental functions. The Task Force was created by a settlement agreement between state and federal entities and a minority class which resolved litigation founded upon federal rights. The County entities involved do not possess controlling authority over the Task Force. The activities of the Task Force are designed to bring various County programs into compliance with federal law. Thus, the Task Force is not subject to rigid adherence to Pennsylvania's Sunshine Act.

Moreover, the Task Force's undertakings essentially are in compliance with Pennsylva-

**19.** South Fayette also complains that the Decree improperly has substituted this court's judgment for that of ACHA. The Decree does not vest this court with any decisionmaking authority in conjunction with the defendants' obligation to bring the County's federal housing programs into compliance with federal law. The court has been vested only with certain limited enforcement powers over the *Sanders* defendants and has no direct role in the defendants' decisionmaking process. The Decree does not vest this court with any oversight as to where any particular units will be located, nor does it permit the court to review whether HUD's and ACHA's expenditure of funds are wise investments which will net

a substantial long-term return. These are areas of the agencies' expertise which remain with those defendants. Under these circumstances, this court's approval of the defendants' agreement of settlement cannot give rise to a cause of action premised on the contention that a government body is failing to exercise appropriately its discretion in carrying out its obligations under law.

**20.** South Fayette's argument that defendants also have violated Pennsylvania's Right–to–Know Act, 65 P.S. § 251 *et seq.,* utterly is devoid of merit. That Act was repealed in 1986.

nia's Sunshine Act. Pursuant to orders which have been entered in *Sanders,* the Task Force is required to hold the beginning portion of its meetings open to the public. Each meeting of the Task Force is transcribed and the transcriptions are made available to the public at least at two separate locations within the County. A third copy is filed in *Sanders* as a matter of public record. The Task Force has been permitted to meet in "executive session" only in conjunction with its decisionmaking process in acquiring real property, an exception explicitly recognized in Pennsylvania's Sunshine Act. *See* 65 P.S. § 278(a)(3) (executory meeting of a public body permitted when it is considering purchasing real property). The public's First Amendment rights of access and information have been carefully considered and accommodated in formulating the orders governing public access to the Task Force and its undertakings. *See* Opinion of July 31, 1997 (Document No. 320) in 88–1261 (applying balancing analysis required by *Pansy v. Borough of Stroudsburg,* 23 F.3d 772 (3d Cir. 1994)).

The court has opted to rule on the defendants' motions to dismiss and thereby implicitly to deny the plaintiff's motion to hold the action in abeyance and its motion for mediation/neutral evaluation, *inter alia,* in order to avoid further delays in the implementation of the *Sanders* Decree arising out of serious misconceptions as to the significance, and application to the Township of South Fayette and other municipalities, of the rulings and legal principles set forth by this court two years ago in *Edgewood* and affirmed on appeal by the United States Court of Appeals for the Third Circuit.

For the foregoing reasons, the court concludes that the plaintiff, Township of South Fayette, lacks standing to assert the claims set forth in its complaint and/or otherwise has failed to state claims upon which relief can be granted; therefore, the complaint will be dismissed against all defendants and plaintiff's motion to hold the action in abeyance and its motion for mediation/neutral evaluation will be denied.

An appropriate order will be entered.

*ORDER OF COURT*

AND NOW, this 17th day of November, 1998, for the reasons set forth in the opinion filed this date, IT IS ORDERED that the complaint of the Township of South Fayette be, and the same hereby is, dismissed against all defendants; and,

IT FURTHER IS ORDERED that the order of this court entered on the 1st day of October, 1998, prohibiting the defendants from utilizing as public housing units the housing units in the Township of South Fayette acquired by the Allegheny County Housing Authority is vacated and those housing units may be utilized as public housing units forthwith; and,

IT FURTHER IS ORDERED that plaintiff's motion for mediation/neutral evaluation (Document No. 26) and its motion to hold action in abeyance (Document No. 35) be, and the same hereby are, denied.